THE CITY OF CHAMPAIGN, Plaintiff-Appellee, *v.* THE KROGER COMPANY, Defendant-Appellant.

Fourth District   No. 15946

Opinion filed September 18, 1980.

WEBBER, J., specially concurring.

Busch, Harrington & Porter, of Champaign, for appellant.

Phipps & Evans, of Champaign (Kurt P. Froehlich of counsel), for appellee.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

Plaintiff, City of Champaign (City), filed a six-count complaint against the Kroger Company, Shapland Construction Company, and Superior Neon Sign Company seeking damages and an injunction. Counts I and II were based on the defendants' putative violation of Champaign City Ordinance No. 1291 (the Interim Sign Ordinance), which limited the size of store signs. In count I, the City sought $75,000 in punitive damages and attorney's fees. Count II, based upon the same allegations, sought an injunction compelling the defendants to remove the signs. The City based counts III and IV on a different ordinance; these two counts alleged that Ordinance No. 1292 had adopted the Building Officials and Code Administrators (BOCA) basic building code and that section 113.0 of the BOCA Code required the defendants to obtain a permit before erecting the three signs. The City again sought $75,000 in punitive damages, fees, and an injunction. Counts V and VI were based on section 1402.0 of the BOCA Code but otherwise were identical to counts III and IV.

The three defendants filed a joint motion for involuntary dismissal of the complaint. On the City's motion, counts I, III, and V—the counts requesting damages—were dismissed. The court denied the defendants' motion to dismiss counts II, IV, and VI.

The City and defendants Kroger and Shapland filed a stipulation of facts before trial. The parties agreed that the Kroger store was located in a

B-3 zoning district permitting intermediate commercial uses; that the defendants disputed the validity of the Interim Sign Ordinance; that the Interim Sign Ordinance, if applicable, would limit the wall signs to 150 square feet each and the free-standing sign to a height of 20 feet and an area of 50 square feet on each face; that the Comprehensive Sign Ordinance, enacted April 15, 1975, would impose the same limits on the wall signs and the same or more stringent limits on the free-standing sign; that each of the wall signs measures approximately 6 feet by 47 feet, for a total area of 279.6 square feet; and that the free-standing sign is 32 feet high and approximately 80 square feet on each side. The parties also stipulated the facts leading up to the installation of the signs: Shapland built the store; Kroger bought the signs directly from Kolux Company as part of the standard equipment for so-called super stores like the one built here; Kroger had Superior install the signs. The City had denied, presumably under the Interim Sign Ordinance, Superior's request for permits to erect the signs. Kroger had delayed installing the sign because Richard Warren, Superintendent of the Environmental Control Division of the Champaign Environmental Department, had told Kroger that the City was considering a new sign ordinance that would possibly contain restrictions different from those in the Interim Sign Ordinance. When the ordinance had not been passed shortly before the scheduled opening of the store, Fred Kallmayer of Shapland asked Warren about progress on the sign law. Kallmayer did not request a permit, and Warren told him that the signs exceeded the size limits set by the Interim Sign Ordinance. Superior, who had been dismissed from the suit, then erected the signs. Before construction began, the City had granted a building permit based on architectural plans showing, among other things, an electric sign. After the signs had been installed, the City granted first a temporary occupancy permit January 3, 1975, and then a permanent occupancy permit five days later. This stipulation also provided that the City had not published the Interim Sign Ordinance after its passage. Except for the City's argument that the defendants had failed to obtain the permits required by the BOCA Code, the parties agreed that the defendants had complied with all the other BOCA requirements.

The case proceeded to a bench trial. Superior was dismissed as a party on the City's motion. The City's only witness was Betty McKown, one of its planning directors; her duties consisted of administering the City's zoning ordinances. Before becoming a planning director, McKown had done planning work for the Champaign County Planning Commission. McKown described the zoning districts and uses of the property adjacent to the Kroger store. Kroger's store is part of the Round Barn Shopping Center, which lies at the northwest corner of Springfield and Mattis streets; Kroger is 1,300 feet west of Mattis, farthest away from

that street of any of the stores. The store occupies the southern edge of a large B-3 commercial area, bordered by apartment buildings to the northwest, west, and south; also directly west of Kroger is an industrial zone. Single- and multiple-family structures are east of the store. The Round Barn elderly project, containing 154 units, and the 96-unit I. H. French apartment complex are directly south of the store; both complexes stand two- to three-stories high, and residents of both are able to see the signs. The Round Barn and French apartments were built in 1976 and 1977. Besides grocery stores, gas stations, bowling alleys, restaurants, and hospitals may also be built in a B-3 district. The Kroger signs were not the only visual blight in the neighborhood; McKown had received several complaints regarding junk littering a vacant lot between the Round Barn units and Kroger. Under the current Comprehensive Sign Ordinance, each of three stores with fronts measuring 60 feet by 25 feet would be allowed signs of 150 square feet. Each of Kroger's wall signs was 280 square feet, less than the total signs permitted for the hypothetical three buildings. The Interim and Comprehensive Sign Ordinances were intended primarily to limit the sizes of signs on buildings in the B-3, intermediate commercial, districts. Based on her experiences in land-use planning, McKown thought that residents generally oppose the commercial development of their neighborhoods.

The defense presented four witnesses. The first, Rudolph Mortimer, was a professor in the Department of Public Health and Safety Education at the University of Illinois and specialized in automobile and pedestrian safety. Mortimer had analyzed the effect of the Kroger signs on the safety of drivers and pedestrians in the area. He had investigated the scene and concluded that the signs did not obstruct anyone's view or otherwise pose a hazard; at night they were beneficial in providing added light. Mortimer thought that the signs did not produce hazardous glare at night; street lights around the store created more glare. Decreasing the size of the signs would not affect traffic safety during the daytime but could possibly make the area less safe at night, depending upon the intensity of the light in the smaller signs. Mortimer conceded, however, that lowering the free-standing sign could increase the illumination in the store's parking lot. Because the amount of glare produced by a source of light depends upon both the size and the intensity of the source, a smaller sign with the same average intensity as the larger one would not cause more glare.

Robert Johnson, a local real estate broker and appraiser, had examined the surrounding property to determine the effect of the signs upon neighboring property values. Johnson thought that the signs were compatible with the mixture of zoning uses in the area and did not appreciably lower the value of nearby real estate. Johnson believed that the signs did not affect the net income generated by the Round Barn and

French apartments. Furthermore, decreasing the size of the signs would not increase the value of the property.

Johnson admitted that he had neither appraised the two apartment complexes nor asked any of their residents whether the presence of the signs made the buildings less desirable as homes. Johnson explained that he could determine the effect of something on property values without appraising the property affected and felt that if the signs were objectionable persons would not live in the area. The City's counsel pointed out that the Round Barn residents receive Federal subsidies to help pay the rent and thus may have a limited choice in deciding where to live. Johnson agreed that persons generally prefer to live in districts less commercial than this one, yet thought that many persons find living in a commercial neighborhood convenient.

Harold Longworth, affiliated with the Superior Sign Company, testified that his company's predecessor, Superior Neon, had erected the signs at issue; they presented no structural hazard. Because Kroger had placed its store so far from Mattis Avenue, large signs were necessary to inform drivers of the location. Longworth estimated that the signs cost Kroger thousands of dollars. Taking down the signs in a manner that would permit their use elsewhere would cost between $1,000 and $1,500; taking them down without worrying about their future use would cost about half that amount. These costs would not have been much lower in early 1974 than at the time of trial. Longworth estimated that constructing and installing custom-made signs to comply with the Interim Sign Ordinance would cost approximately $25,000.

Longworth testified that it was not Superior's practice to erect structures without obtaining the necessary building permits and that the company had not received a permit for these signs.

Ove Uggerby, an architect in the local firm that designed the store, had studied aesthetics as part of his professional training and education. He testified that the free-standing sign should be twice as big to be in proportion with the store; the two wall signs were the proper size. The 150-square-foot maximum in the Interim Sign Ordinance would result in disproportionately small and aesthetically displeasing wall signs in cases of large buildings; height restrictions would have the same effect. Uggerby agreed that other architects might think that the signs should be smaller; he based his aesthetic opinion on his architectural training and experience. Uggerby said that in drawing up architectural plans, local ordinances and building codes are followed. Uggerby agreed, however, that when his aesthetic opinion conflicted with a building restriction, the client would be told of the restriction.

The trial judge's written order enjoined Kroger from using the signs, finding that the signs exceeded the limits set by the Interim Sign

Ordinance, that Kroger had installed the signs without first obtaining the building permit required by Ordinance No. 1292 and a sign permit, that the failure to publish the Interim Sign Ordinance did not render it void, and that the Interim Sign Ordinance was not unconstitutionally vague or unreasonable but was reasonably necessary to protect the public health, safety, and welfare.

The trial court dismissed Shapland as a party and denied Kroger's post-trial motion. On appeal Kroger, the only remaining defendant, raises numerous issues going to the validity of the Interim Sign Ordinance and the City's ability to obtain an injunction.

■■■ Zoning ordinances are presumed to be valid; the party challenging the presumption has the burden of establishing by clear and convincing evidence that the ordinance is "arbitrary, capricious or unrelated to the public health, safety and morals." (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46, 145 N.E.2d 65, 68.) *La Salle* (1957) listed the following six considerations as bearing on the validity of a zoning ordinance: (1) The uses and zoning of surrounding property; (2) the effect of the challenged ordinance on the value of the property in question; (3) the degree to which decrease in value caused by the ordinance promotes the public health, safety, and welfare; (4) the balance between the public gain and the private loss (in effect a comparison of the second and third elements); (5) the suitability of the property to its zoned use; and (6) the length of time the property has been vacant compared to the pace of development in the area. These factors are conceptually distinct from the reasonable basis suggested by the municipality for the ordinance's validity; the court balances these six against what the public welfare requires, expressed by the zoning ordinances. "Balance" is a favorite but possibly misleading metaphor describing the analysis a court conducts when forced to choose between equally valid and competing interests; because the challenger of a zoning ordinance must overcome its validity by clear and convincing evidence, he must do more than just slightly tip the scales his way.

Applying the six criteria listed in *La Salle* (1957) to the facts in this case shows that Kroger's argument against the ordinance is inconclusive rather than persuasive.

(1) Surrounding property: The witnesses and exhibits disclosed that the property around Kroger's store was zoned for a variety of uses; the area contained a mixture of commercial and residential buildings, including the Round Barn and French apartment buildings. The defendant does not challenge the validity of its zoning classification, B-3, but rather the value in limiting the size of signs in a B-3 district.

(2) Property value: The defendant does not contend that the sign restrictions will lessen the value of its property; no evidence was

introduced to show that smaller signs would decrease the number of customers. (*Cf. Sun Oil Co. v. City of Madison Heights* (1972), 41 Mich. App. 47, 199 N.W.2d 525, where the owner of a gas station located off an interstate highway argued that limits on the heights of his signs were decreasing business by 75 percent; the court upheld the validity of the ordinance.) The defendant did introduce evidence, however, showing the price of replacing the signs; Longworth testified that demolishing the existing signs and buying and installing new ones would cost between $25,000 and $26,000. Yet the defendant knew the contents of the Interim Sign Ordinance before it installed noncomplying signs; Longworth estimated the cost of those signs to be thousands of dollars, but could not otherwise compare the costs of standard and custom-made signs. Any loss suffered by the defendant was of its own making.

(3) Promoting public benefits: Mortimer believed that the large size of the signs may benefit the public by providing additional light in the store parking lot. But lights rather than signs are more suited to that purpose. McKown referred to lessening the impact of the commercial area on nearby residents.

(4) Public gain versus private loss: As discussed under the second consideration, the extent of Kroger's loss is problematic; balancing an unknown is as meaningless as dividing by zero. The public gain is unquantifiable. Even if Kroger's loss appears to be greater than the off-setting benefit to the public, equities favor the City because Kroger could have avoided the loss by complying with the ordinances.

(5) Suitability to the zoned use: This consideration is irrelevant here because it pertains to cases of rezoning.

(6) Period of vacancy: Again, this consideration is inapplicable here; enforcing the sign ordinance would not deprive Kroger of the use of its property.

Although this case does not involve rezoning, Kroger's attack on the validity of the ordinance as applied to its property involves many of the same questions that arise when a landowner seeks to have his property reclassified. Zoning ordinances unreasonably restricting an owner's use of his property are invalid. *Ziman v. Village of Glencoe* (1971), 1 Ill. App. 3d 912, 275 N.E.2d 168; *Mobile Oil Corp. v. City of Rockford* (1972), 8 Ill. App. 3d 649, 290 N.E.2d 7.

Kroger does not present a strong argument under the six considerations of *La Salle* (1957); Kroger's case therefore will stand or fall depending on how reasonably related the Interim Sign Ordinance is to the zoning trinity of public health, safety, and welfare. This requires us to explore the intent of the ordinance. The purpose of the Interim Sign Ordinance is primarily aesthetic: The City wanted to minimize the commercial nature of B-3 districts. Courts in this State and others have

frequently discussed whether aesthetic concerns can sustain a zoning ordinance. Under the old rule, aesthetics was neither a necessary nor a sufficient reason for upholding an ordinance. A more recent series of cases upholds ordinances based solely or mainly on aesthetic concerns. Even the old cases, however, did not invalidate ordinances based incidentally or marginally on aesthetics; the courts in effect ignored the aesthetic purpose and looked only to the underlying nonaesthetic intentions. See Annot., *Aesthetic Objectives or Considerations as Affecting Validity of Zoning Ordinances*, 21 A.L.R.3d 1222 (1968).

The case law in Illinois has followed this national trend. The old cases deserve discussion because they have never been expressly overruled. *City of Chicago v. Gunning System* (1905), 214 Ill. 628, 73 N.E. 1035, dealt with an ordinance requiring, among other things, approval by the residents before advertising signs could be placed in their neighborhood and the payment of a fee for signs that exceeded specified restrictions on size. Although conceding that ordinances could establish construction standards for signs, the court dismissed the purpose of the ordinance as merely "sentimental," designed to protect the appearance of the neighborhood. The court also thought that the provision for the fine was unreasonable because it would have required the defendant to pay more in penalties than it had earned.

The supreme court gradually established a doctrinal basis for rejecting aesthetic concerns in zoning. *Haller Signworks v. Physical Culture Training School* (1911), 249 Ill. 436, 94 N.E. 920, which invalidated a State law that prohibited the placement of advertising signs within 500 feet of a public park or boulevard, gave two reasons for its result: first, aesthetics is not a component of the public welfare, and second, establishing standards of taste in zoning laws infringes upon personal liberty and thus is inimical to this country's theory of government. *Forbes v. Hubbard* (1932), 348 Ill. 166, 180 N.E. 767, added a third principle: aesthetic judgments, unlike those pertaining to the public welfare, are too subjective. In *Forbes* the landowner sought to have his property rezoned from residential to commercial; evidence showed that the commercial value of the property was seven times greater than its residential value. Although the municipality did not argue that the residential classification fostered aesthetics, the court said:

> "The test to be applied is whether such destruction of value promotes the public health, safety, morals or general welfare. It is generally recognized that aesthetic considerations, while not wholly without weight, do not of themselves afford sufficient basis for the invasion of property rights, and this for the more or less obvious reason that while public health, safety and morals, which make for public welfare, submit to reasonable definition and

delimitation, the realm of the aesthetic varies with the wide variation of tastes and culture. So, while it has been held that all uses of property or courses of conduct which are injurious to the health, comfort, safety, morals and welfare of society may be prohibited under the sovereign power of the State, though the exercise of such power result in inconvenience or loss to individuals, that power must find basis in the doctrine of overruling necessity or bear substantial relation to the public good and may not be based alone on aesthetic considerations. [Citations.]" (348 Ill. 166, 181, 180 N.E. 767, 773.)

With this the court firmly established, for the time being at least, the maxim, "There is no disputing tastes" in zoning law. *State Bank & Trust Co. v. Village of Wilmette* (1934), 358 Ill. 311, 193 N.E. 131, reached a similar result, invalidating an ordinance that prohibited the landowner from building a gas station on his property; the forbidden purpose of the ordinance was aesthetic.

An exception soon developed to the rule that aesthetics alone could not justify zoning ordinances. *Chicago Park District v. Canfield* (1939), 370 Ill. 447, 19 N.E.2d 376, invalidated for other reasons a local ordinance that prohibited cars displaying advertising signs from driving through city parks. The court acknowledged that the purpose of the ordinance was primarily aesthetic but said that municipalities may impose greater restrictions on public than on private property; as parks exist to provide relief from the "many large grim-walled buildings," an ordinance designed to maintain beauty, unspoiled by commercial intrusion, is not invalid for that reason alone.

*Federal Electric Co. v. Zoning Board of Appeals* (1947), 398 Ill. 142, 75 N.E.2d 359, implicitly reaffirmed *Canfield's* distinction between a municipality's power to control public and private property. A local ordinance restricted the height of structures to 30 feet. Two radio transmission towers standing 156 feet high carried signs saying "Zenith Radio"; the tops of the signs were 75 feet off the ground and had replaced a shorter nonconforming sign attached to the roof of an adjacent two-story building. The court held that the larger signs did not expand the former use and added that although the police power includes the power to regulate structural height, municipalities may not exercise that power "exclusively for the purpose of gratifying and cultivating aesthetic tastes" (398 Ill. 142, 147, 75 N.E.2d 359, 362), which is unrelated to the public health, safety, and welfare.

With *La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 312 N.E.2d 625, the court joined the recent trend of cases giving greater weight to the aesthetic concerns expressed by zoning ordinances. Although not expressly overruling the old cases such as *Forbes* and *Haller*,

*La Salle* (1974) implicitly rejected the rule that automatically invalidated zoning ordinances based solely or mainly on aesthetic reasons. In *La Salle* (1974) a landowner sought to have his property reclassified to permit him to build an apartment building; the surrounding area contained a variety of uses, ranging from single-family homes to hotels. The supreme court reversed the two lower courts' decisions invalidating the ordinance and granting the requested reclassification. After considering other points bearing on the ordinance's validity, the court turned to the city's evidence that the planned building would be quite dissimilar to others in the area and thwart the city's desire to have progressively shorter buildings near Lake Michigan:

> "As was said in *Trust Co. of Chicago v. City of Chicago*, 408 Ill. 91, 100, 'A zoning ordinance may not be based alone on aesthetic considerations [citation], although it is no objection to such an ordinance that it tends to promote an aesthetic purpose, if its reasonableness may be sustained on other grounds.' Thus prior decisions of this court, while recognizing aesthetic elements, have not deemed them to be controlling in zoning cases. [Citation.] The reason advanced for declining to afford aesthetic qualities significant import is that the subject does not lend itself to exact definition but varies as to personal taste. [Citations.] However, there would appear to be significant authority that aesthetic factors may, in some instances, be utilized as the sole basis to validate a zoning classification [citations] or be acknowledged as a viable factor in zoning determinations [citation]. We are of the opinion that in the present case aesthetic qualities are a properly cognizable feature and that the evidence presented is supportive of [the town's argument that the classification is not arbitrary but rather accords with public welfare]." (57 Ill. 2d 415, 432, 312 N.E.2d 625, 634.)

The court did not list the instances when aesthetics alone may justify restrictions on property or even expressly say that Illinois now belonged to that chain of "significant authority."

*Metromedia, Inc. v. City of Des Plaines* (1975), 26 Ill. App. 3d 942, 326 N.E.2d 59, affirmed the decision that an ordinance prohibiting nonaccessory, *i.e.*, off-premises, signs was invalid. The court thought that no rational basis justified distinguishing on-premises from off-premises signs. The ambiguity of *La Salle* (1974) became apparent: *Metromedia* cited it for the proposition that "[a]esthetic considerations alone cannot validate an ordinance enacted pursuant to the police power." (26 Ill. App. 3d 942, 946, 326 N.E.2d 59, 62.) *Ward v. County of Cook* (1979), 68 Ill. App. 3d 563, 386 N.E.2d 309, interpreted *La Salle* (1974)) for the opposite view. In upholding a zoning ordinance that required residential lots to be

a certain size, *Ward* said that "the aesthetic enjoyment of one's home," referring to the homes surrounding the landowner's property, was a recognized criterion in zoning. *Ward* also construed *La Salle* (1974) to mean that aesthetics " 'may, in some instances, be utilized as the sole basis to validate a zoning classification * * *.' " (68 Ill. App. 3d 563, 571, 386 N.E.2d 309, 316.) This is a fair reading of *La Salle* (1974), where the city relied mainly on aesthetic considerations in opposing the rezoning sought by the landowner. In *Grobman v. City of Des Plaines* (1975), 59 Ill. 2d 588, 322 N.E.2d 443, the supreme court implicitly added aesthetics as an element of the public health, safety, and welfare. *Grobman* dealt with an ordinance setting minimum sizes for lots with homes. The court said that "any substantial relation to the public health, safety, comfort, or welfare" would sustain a zoning ordinance. The plaintiff's lot measured 25 feet by 125 feet; most of the lots in the area had front property lines at least twice as large. The court seized on the testimony of one of the city's experts that a house on a lot as narrow as the plaintiff's would "not only adversely affect the adjoining houses by impeding the flow of light and air but would adversely affect the aesthetics of the general area as well. Aesthetics may be a consideration in the determination of an ordinance's reasonableness (citing *La Salle* (1974)), and we deem it was properly a consideration here." 59 Ill. 2d 588, 595, 322 N.E.2d 443, 447.

Although the supreme court does not discuss in either *La Salle* (1974) or *Grobman* the subjectivity objection to aesthetic zoning, that argument is much weaker than *Forbes* and its progeny assumed. Only in the sense that aesthetic standards are difficult to articulate is the objection relevant; yet ordinances restricting the size or location of signs may be as clear and definite as zoning ordinances lacking an aesthetic purpose. (See Williams, *Subjectivity, Expression, and Privacy: Problems of Aesthetic Regulation,* 57 Minn. L. Rev. 1 (1977); Williams also finds no constitutional difficulty in restricting commercial, as opposed to political, signs.) Rather than being vague, the Interim Sign Ordinance provides explicit rules governing signs in B-3 districts.

■■ An aesthetic basis for a zoning ordinance does not necessarily render it valid. For example, in *Johnston v. City of Geneva* (1976), 37 Ill. App. 3d 578, 346 N.E.2d 444, the plaintiff wanted to establish a business in her home; her lot was zoned for multiple-family residences. Much of the area immediately surrounding her house, however, was already commercial, containing small shops in homes. The court distinguished *La Salle* (1974) and *Grobman* on the basis that in those cases the desired use was quite dissimilar to the surrounding uses. The court believed that maintaining the current zoning classification would not serve aesthetic purposes, implicitly recognizing that aesthetics alone may validate a zoning ordinance.

Several decisions from this court with regard to the area around Lincoln's Home have placed the concept of historic preservation, a corollary of aesthetic balance, within the scope of public welfare. In *Rebman v. City of Springfield* (1969), 111 Ill. App. 2d 430, 250 N.E.2d 282, and its companion case, *M & N Enterprises, Inc. v. City of Springfield* (1969), 111 Ill. App. 2d 444, 250 N.E.2d 289, this court reversed trial court decisions invalidating a Springfield ordinance that barred businesses from the Lincoln Home Historical District. *Rebman* held that a municipality may impose zoning restrictions under its police power to preserve the historical character of a neighborhood; the court placed historical preservation within the familiar zoning concept of public health, safety, and welfare.

The case law thus shows a gradually broadening view of the power of municipalities to regulate the appearance of their communities. *Cromwell v. Ferrier* 1967), 19 N.Y.2d 263, 279 N.Y.S.2d 22, 225 N.E.2d 749, illustrates the progress in this field. *Cromwell* upheld the validity of a local ordinance that prohibited nonaccessory signs. The court fairly assumed that aesthetic reasons alone provided the rationale for the ordinance and referred to the gradual acceptance of the view that an ordinance may be valid even if based solely or mainly on aesthetic concerns. *Cromwell* cautioned, however, that not just any aesthetic concern would suffice:

> "The exercise of the police power should not extend to every artistic conformity or nonconformity. Rather, what is involved are those esthetic considerations which bear substantially on the economic, social, and cultural patterns of a community or district. Advertising signs and billboards, if misplaced, often are egregious examples of ugliness, distraction, and deterioration. They are just as much subject to reasonable controls, including prohibition, as enterprises which emit offensive noises, odors, or debris. The eye is entitled to as much recognition as the other senses, but, of course, the offense to the eye must be substantial and be deemed to have material effect of the community or district pattern." 19 N.Y.2d 263, 272, 279 N.Y.S.2d 22, 30, 225 N.E.2d 749, 755.

Thus, aesthetics should be viewed as a component of the public welfare. In *Berman v. Parker* (1954), 348 U.S. 26, 33, 99 L. Ed. 27, 38, 75 S. Ct. 98, 102-03, the court defined "public welfare" within the context of condemnation actions:

> "The concept of the public welfare is broad and inclusive. [Citation.] The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as

well as healthy, spacious as well as clean, well-balanced as well as carefully patroled."

And in *Village of Belle Terre v. Boraas* (1974), 416 U.S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536, the Supreme Court upheld a village ordinance that limited to two the number of unrelated persons that could inhabit a home. Zoning law permits legislatures to draw any line having a reasonable rather than an arbitrary relation to a permissible State objective. The court found that the village ordinance was reasonably related to the permissible objective of maintaining the uncrowded and relaxed nature of the community:

"A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one within *Berman* * * *. The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." 416 U.S. 1, 9, 39 L. Ed. 2d 797, 804, 94 S. Ct. 1536, 1541.

■■ To summarize, Illinois now follows the better view that aesthetics is an element of the public health, safety, and welfare. *LaSalle* (1974) and *Grobman* effectively—albeit not expressly—overruled the line of cases beginning with *Gunning* that illustrates the old "forbidden purpose" rule on the role of aesthetics in zoning. The welfare of a community includes its appearance: Municipalities may enact zoning laws regulating, among other things, the dimensions of commercial signs. We therefore agree with the trial court that the Interim Sign Ordinance was reasonably related to achieving this legitimate purpose.

Kroger also argues that because the Interim Sign Ordinance was penal, State law required its publication. We reject both the premise and the conclusion of this argument. The counts in the City's complaint seeking penalties were dismissed before trial. Nothing in the Interim Sign Ordinance itself provides for a penalty. Furthermore, because the ordinance applied only prospectively, it did not work a forfeiture on signs existing at the time of its passage; Kroger erected its signs after the effective date of the ordinance and with full knowledge of it.

■■ Section 1—2—4 of the Illinois Municipal Code (Ill. Rev. Stat. 1979, ch. 24, par. 1—2—4) requires the publication of "[a]ll ordinances of cities, villages and incorporated towns imposing any fine, penalty, imprisonment, or forfeiture, or making any appropriation, * * *." Even if the Interim Sign Ordinance is construed to impose a penalty or require a forfeiture, the Municipal Code is inapplicable here because the city is a home rule unit under article VII, section 6, of the 1970 constitution. (Ill. Const. 1970, art. VII, §6.) In *Johnny Bruce Co. v. City of Champaign*

(1974), 24 Ill. App. 3d 900, 321 N.E.2d 469, this court held that home rule powers include zoning; the city is not limited by State zoning enabling statutes. (See also *Cain v. American National Bank & Trust Co.* (1975), 26 Ill. App. 3d 574, 325 N.E.2d 799.) Kroger argues that State law applies because the City's Ordinance No. 1151, passed October 26, 1972, adopted all the provisions of chapter 24 except those specifically altered by that ordinance. Yet *Bruce* arose and was decided after No. 1151 had gone into effect; we adhere to our conclusion that the city has plenary powers over zoning.

■■ Kroger also argues that the failure to publish the Interim Sign Ordinance rendered it void because it was not enacted with the equal dignity of an earlier zoning scheme modified by the ordinance. The earlier ordinance, passed in 1965, had to be published, however, because the Municipal Code then applied to the city; Champaign did not become a home rule unit until the 1970 constitution went into effect. In making its equal dignity argument, Kroger relies on a distinguishable class of cases holding that interim resolutions declaring moratoria on the issuance of building permits have no force. (*Sgro v. Howarth* (1964), 54 Ill. App. 2d 1, 203 N.E.2d 173; *Phillips P/etroleum Co. v. City of Park Ridge* (1958), 16 Ill. App. 2d 555, 149 N.E.2d 344.) Those two cases involved resolutions passed by the city councils after the property owners had already filed for building permits that they were entitled to receive under the existing classifications. The council resolutions did not alter the zoning laws but merely declared moratoria on the issuance of building permits pending studies by the municipalities' zoning commissions. *Sgro* and *Phillips* invalidated the resolutions to prevent the cities from suspending at will their zoning schemes. Although the ordinance here is called "interim" and was designed to fill the gap until the City could settle on the precise terms of the Comprehensive Sign Ordinance, the Interim Ordinance did more than declare a moratorium. It provided an explicit series of rules governing the B-3 districts, standards which the Comprehensive Sign Ordinance did not in fact alter. Moreover, the Interim Sign Ordinance was in effect before Kroger erected the signs; a landowner is not entitled to a permit if he applies when the municipality is already considering zoning changes. (*Westerheide v. Obernueferman* (1972), 3 Ill. App. 3d 996, 279 N.E.2d 402; *Chicago Title & Trust Co. v. Village of Palatine* (1959), 22 Ill. App. 2d 264, 160 N.E.2d 697.) Thus, even if we regarded the Interim Sign Ordinance as just a pending proposal for change, the City would not have been required to issue permits for the signs erected.

Kroger also argues that Ordinance No. 1292, by adopting the 1970 BOCA Code and its 1973 supplement, implicitly repealed the Interim Sign Ordinance. Ordinance No. 1292 was passed by the Champaign City Council 15 days after the Interim Sign Ordinance. Kroger bases its

argument on section 7 of No. 1292, which repeals inconsistent ordinances already in effect. Although article 14 of the BOCA Code permits signs 100 feet tall if made of noncombustible materials, the purposes of the BOCA Code and the Interim Sign Ordinance are entirely different. Article 14 provides construction and maintenance standards for signs in outdoor display structures; the provisions pertain to safety rather than aesthetics. Because the Interim Sign Ordinance and article 14 of the BOCA Code were written with different purposes in mind, the Interim Sign Ordinance supplements rather than conflicts with Ordinance No. 1292. Even if the two ordinances are deemed to conflict, however, sections *101.4* and *1400.1* of the BOCA Code provide that when both the building code and zoning laws are applicable, the one with the more restrictive standards governs, thus deferring in this case to the Interim Sign Ordinance.

Kroger also argues that the city is estopped from enforcing the Interim Sign Ordinance because after being told that the city council was contemplating a new sign ordinance Kroger briefly postponed installing the signs, and because the City had reviewed and approved Kroger's blueprints showing the dimensions of a sign on the store's east wall. Kroger also bases its estoppel argument on the City's grant of temporary and permanent occupancy permits after the signs were erected. Yet the defendant never obtained the necessary permits required by the Interim Sign Ordinance and knew that its signs conflicted with the provisions in that ordinance. The City never told Kroger that the planned signs conformed to the restrictions in the Interim Sign Ordinance. The City is not attempting to revoke permits already issued; not only did Kroger know before incurring the expense of installing these signs that they failed to comply with the Interim Sign Ordinance, it was also aware that separate sign permits were necessary. We do not think that the City's approving blueprints and issuing occupancy permits promised approval of the sign permits. Kroger's reliance was disingenuous and unfounded. *Cf. City of Peru v. Querciagrossa* (1979), 73 Ill. App. 3d 1040, 392 N.E.2d 778; *Richards v. City of Highland* (1978), 59 Ill. App. 3d 692, 375 N.E.2d 1023.

■▌ Count IV of the City's complaint is based on section 113.1 of the BOCA 1973 supplement; that section requires a landowner to obtain a permit before constructing a building. Kroger argues that signs are not buildings and therefore section 113.1 does not apply. Yet section 201.0 of the 1973 supplement defines a building as "any structure used or intended for supporting or sheltering any use or occupancy." A structure is defined as "that which is built or constructed." Thus the definition of "building" includes the structures here, the signs. The 1970 edition of the BOCA Code had defined "building" as "a structure enclosed within exterior walls or fire walls, built, erected and framed of component structural parts,

designed for the housing, shelter, enclosure and support of individuals, animals, or property of any kind," and had defined "structure" as "an assembly of materials forming a construction for occupancy or use including among other things, buildings, stadiums, gospel and circus tents, reviewing stands, platforms, stagings, observation towers, radio towers, water tanks, trestles, piers, wharves, open sheds, coal bins, shelters, fences and display signs." The changes made by the supplement broadened the definition of "building" to include the items listed under "structure" in the 1970 definitions. Section 113.1 of the 1973 supplement therefore applied to the signs in this case.

The defendant argues that its mere failure to obtain the necessary permits for the signs does not justify enjoining it from using the signs and relies on *County of Cook v. Hoytt* (1965), 59 Ill. App. 2d 368, 208 N.E.2d 410. In *Hoytt* the property owner had not obtained a permit when he moved his house trailer onto his land; locating the trailer on the land was a permitted use, however, and the owner would have been entitled to a permit. The court held that the failure to obtain a permit did not convert the legal use of the land into an illegal one. The court said, "Of course, if the use being made of the property was one not allowed in the particular district by the zoning ordinance, the county could successfully enjoin such use, * * *." (59 Ill. App. 2d 368, 380, 208 N.E.2d 410, 415.) *Hoytt* thus supports the City's position here; Kroger could not obtain a permit for the signs, for only signs complying with the Interim Sign Ordinance were entitled to building permits. The sensible remedy here is to order the defendant to discontinue using and remove the noncomplying signs. *Rezler v. Village of Riverside* (1963), 28 Ill. 2d 142, 190 N.E.2d 706; *Oak Forest Mobile Home Park, Inc. v. City of Oak Forest* (1975), 27 Ill. App. 3d 303, 326 N.E.2d 473.

We affirm.

TRAPP, J., concurs.

Mr. JUSTICE WEBBER, specially concurring:

I concur in the result reached in the principal opinion but I cannot abide easily with all it has to say on the pantomorphic subject of aesthetics in zoning. That matter is far less clear and settled than the principal opinion would lead us to believe. It admits that its principal authority, *La Salle* (1974), is ambiguous, and further admits that "this case does not involve rezoning."

Under the doctrine of *County of Lake v. MacNeal* (1962), 24 Ill. 2d 253, 181 N.E.2d 85, there can be some question of the right of the defendant here to contest the validity of the ordinance as applied to its

property. It is less than clear why the city of Champaign, as shown in the preamble thereof, elected to make the sign ordinance part of its zoning ordinance. As a home rule unit under article VII, section 6, of the 1970 Constitution (Ill. Const. 1970, art. VII, §6), the city had adequate power to enact a sign ordinance independent of any zoning laws. The fact that the city chose a particular method of pigeonholing the sign ordinance should not serve as a predicate for a dissertation on a subject not directly involved.

The heart of this case is that the defendant knowingly violated the sign ordinance. To that extent there is a difference from *MacNeal*, where the defendants were relying upon a prior adjudication of a nonconforming use and the principal question was the breadth of language in the prior decree. In the instant case, the defendant had no semblance of justification for a deliberate violation except insofar as it appears to say that it will obey only such laws as it itself deems just.