HOWARD L. WAKELAND *et al.*, Plaintiffs-Appellants, v. THE CITY OF URBANA, ILLINOIS, Defendant-Appellee (Daniel Folk *et al.*, Intervenors-Appellees).

Fourth District   No. 4—01—0991

Argued June 16, 2002.—Opinion filed July 26, 2002.—Modified on denial of rehearing September 19, 2002.

Glenn A. Stanko (argued), of Rawles, O'Byrne, Stanko & Kepley, P.C., of Champaign, for appellants.

Jack Waaler, City Attorney, of Urbana (Stephen Holz (argued), Assistant City Attorney, of counsel), for appellee City of Urbana.

Jeffrey W. Tock, of Harrington, Tock & Royse, of Champaign, for appellees Daniel Folk and W. Randall Kangas.

JUSTICE APPLETON delivered the opinion of the court:

Plaintiffs, Howard and Craig Wakeland, acquired three lots in the 800 block of West Main Street in Urbana, Illinois, intending to tear down the houses on the lots and replace them with an apartment building. Before the Wakelands carried out that plan, the city "downzoned" the lots, restricting them to single-family residential use. The Wakelands filed a complaint for declaratory judgment against the city, asking the trial court to declare the ordinance unconstitutional as applied to them. Daniel Folk and W. Randall Kangas owned homes near the lots and opposed any further proliferation of apartment buildings in the neighborhood. They filed a petition to intervene, which the trial court granted. After a bench trial, the trial court upheld the ordinance. The Wakelands appeal, arguing that the factors in *La Salle National*

*Bank of Chicago v. County of Cook*, 12 Ill. 2d 40, 46-47, 145 N.E.2d 65, 69 (1957), and *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370, 378, 167 N.E.2d 406, 411 (1960), clearly entitled them to declaratory relief. We disagree with the Wakelands and affirm the trial court's judgment.

## I. BACKGROUND

On July 1, 1985, the city created an enterprise zone encompassing the 800 block of West Main Street. The city mailed letters and brochures to local businesspeople, including the Wakelands, encouraging them to invest in the enterprise zone and offering incentives to do so, including financial assistance, exemptions from sales tax on building materials, tax investment credits, and abatement of real estate taxes.

The Wakelands had already built a six-unit apartment building at 813 West Main Street. Intrigued by the incentives the city offered, they conceived the idea of buying the three lots next to 813 West Main Street, tearing down or moving the six-unit apartment building, and building a 48-bedroom (12-unit) apartment building on the four lots. Since 1978, they had built 26 apartment buildings in Champaign-Urbana. Because the University of Illinois was nearby and its north campus was expanding, apartments were in demand. Howard Wakeland made sure that the three lots, 807½, 809, and 811 West Main Street, were zoned as R-4 (medium-density, multiple-family residential). In October 1986, the Wakelands bought the three lots.

The Wakelands' six-unit apartment building stood at the southeast corner of the intersection of Main Street and Lincoln Avenue. The three lots were beside it, on the same side of the street. Lincoln Avenue, a four-lane arterial highway, extends north and south through the length of the city and intersects with Interstate Highway 74 to the north. Main Street extends into the downtown business district some four blocks east of Lincoln Avenue. The downtown begins at roughly the intersection of Main Street and McCullough Avenue. Immediately west of Lincoln Avenue, Main Street enters the university's north campus. One block north of Main Street is Clark Street. One block south is Stoughton Street.

Run-down houses, ranging from 70 to 90 years old, stood on the three lots; former owners had converted them into rental properties. The house at 809 West Main Street was a rooming house. The house at 807½ West Main Street was divided into two apartments, and the house at 811 West Main Street, a large Victorian house, was divided into three apartments. The Wakelands intended to redevelop the lots within three or four years after buying them. In the meantime, they

continued to rent the houses to tenants. On May 14, 1995, the house at 811 West Main Street burned down. Although the Wakelands collected $50,000 in insurance for that house, they never built anything in its place. At the time of trial, tenants occupied the other two houses. The Wakelands never built the apartment buildings and never did anything in anticipation of building them, such as preparing diagrams or blueprints, buying building supplies, or applying for a building permit.

Howard Wakeland testified:

"[T]he fact that you buy property right now doesn't mean that you're necessarily going to build on a property. It means that you have put it in your inventory for the future, for development, and you're going to pull it out when you need it."

On October 17, 1988, the city council passed a resolution directing the Urbana planning commission (Commission) to study the "Downtown to Campus Area," a broad tract of 500 acres between the university and downtown, and to recommend how to reconcile the diverse uses of land in the area. Urbana Resolution No. 8889—R8 (eff. October 19, 1988). The mayor approved the ordinance on October 19, 1988. One of the objectives of the study was to "[i]dentify methods for protecting and preserving the character, scale[,] and appearance of the low[-]density residential sections of the [s]tudy [a]rea." Urbana Resolution No. 8889—R8 § 3(6) (eff. October 19, 1988).

In the summer of 1988, the Commission invited the public to come to meetings and identify problems in the current use of land within the study area. In late 1988, the Commission gathered data about the study area, including land uses, zoning, infrastructure, traffic, and the age of structures. The Commission acquired the data by field surveys— walking or driving through the entire area, building by building, block by block—and from public records, such as township assessor records, tax rolls, and utility records. To assess the historical significance of houses, the Commission relied on a 1985 survey by the Preservation and Conservation Association, a nonprofit group of architects and historians. This survey discussed the age and architectural styles of houses in a large portion of the study area, including Main Street from Lincoln Avenue to downtown. In June 1990, after 30 public meetings, followed by open meetings of the city council, the Commission published its "Downtown to Campus Plan."

The "Downtown to Campus Plan" was an 82-page document setting forth the Commission's findings and recommendations, supported by historical overviews, maps, and housing and population statistics and projections. The document described a proliferation of apartment buildings that threatened the neighborhood's single-family homes,

many of which were old and architecturally significant. According to the document, the area was losing its historic appearance. During the 1980s, nearly 40 apartment buildings went up, often right next to single-family homes, with no intervening buffer or screening. Since 1965, the number of dwelling units in the study area had increased by 90%. With the apartment buildings came more noise, more traffic, more people. Parking spaces grew increasingly scarce. Because of encroaching development, homeowners were moving out of their stately old houses, turning them into apartment buildings and rooming houses, and letting them decay.

Recognizing that "[t]he Downtown to Campus *** Area [was] one of the most diverse neighborhoods in Urbana," the Commission attempted to balance the competing uses of land. The Commission said: "This required compromise and trade-offs between the interests of single-family homeowners, apartment owners, developers, businesses[,] and the University." The existing zoning ordinance was "inadequate to protect [the area's] unique qualities." Therefore the "Downtown to Campus Plan" recommended the down-zoning of many properties. For instance, it recommended changing the zoning classification of most of the properties on Main Street, between Lincoln Avenue and McCullough Street four blocks to the east, from higher-density uses to low-density residential (*i.e.*, single-family housing). The lots at 807$^{1}/_{2}$, 809, and 811 West Main Street fell within the proposed low-density residential area.

On November 21, 1988, more than two years after the Wakelands bought the lots, the city council passed an ordinance creating an interim development district. Urbana Ordinance No. 8889—32 (eff. November 22, 1988). The mayor approved the ordinance on November 22, 1988. The ordinance prohibited multiple-family development in the interim development district except for reconstruction because of fire, explosion, or an act of God. Urbana Ordinance No. 8889—32 § XIII—6(A) (eff. November 22, 1988). The Wakelands' properties on West Main Street lay within the interim development district.

In the preamble to the ordinance, the city council found that "existing zoning regulations *** permit developments which may be incompatible with the current residential density and neighborhood character of the [s]tudy [a]rea." Urbana Ordinance No. 8889—32, at 2 (eff. November 22, 1988). Therefore, the city council anticipated that "[t]he Downtown to Campus Study will recommend a neighborhood land use plan to amend the 1982 Urbana Comprehensive Plan and may also recommend *** zoning ordinance amendments." Urbana Ordinance No. 8889—32, at 2 (eff. November 22, 1988).

The Commission criticized the 1982 comprehensive plan for doing

nothing tangible to preserve single-family residential neighborhoods. As the "Downtown to Campus Study" noted, the 1982 plan "emphasized two diverse and often conflicting goals, '[c]onservation' and '[d]evelopment,' " but the plan took no practical steps toward conservation. The study explained: "[T]he 1982 Plan did not propose any widespread land use or zoning changes to protect the area despite its emphasis on conserving older residential neighborhoods." In fact, according to the study, the plan "allow[ed] much higher residential densities than the neighborhood currently ha[d]. If new development occur[red] at these [permissible] densities," the area would continue to lose its quiet, historical character. The Commission recommended that the city council amend the 1982 comprehensive plan by adopting the "Downtown to Campus Study." The city council did so on June 4, 1990.

On January 22, 1991, the city council passed an ordinance rezoning 203 properties, including the Wakelands' three lots on Main Street. Urbana Ordinance No. 9091—75 (eff. January 22, 1991). Over the Wakelands' objections, the ordinance down-zoned the three lots from R-4 to R-2 (single-family residential). The mayor vetoed the ordinance on January 31, 1991, but the city council overrode his veto on February 4, 1991. The city codified and republished the ordinance as Ordinance No. 9293—124 (eff. July 1, 1993). Whenever the ordinance changed a multiple-family residential structure, rooming house, or duplex from R-4 to R-2, that property became a legally nonconforming use. One could not structurally alter the building. If the building burned down or suffered substantial fire damage, the owner could replace it only with a conforming structure, *i.e.*, a single-family residence or, with a conditional use permit, a duplex.

In its rezoning, the city departed from the "Downtown to Campus Plan" in a few instances. For example, the study recommended downzoning some church buildings on Main Street, the Canaan Baptist Church and St. Patrick's Church, to R-2 and making them legally nonconforming uses; but for reasons that are unclear, the city left them as R-4. Similarly, Paul Smith owned five rental houses on Stoughton Street, and although the Commission recommended down-zoning these houses to R-2, the city zoned them R-4. Additionally, on the south side of Clark Street, in the 800 block, some houses remained R-4, contrary to the Commission's recommendation.

On March 24, 1995, the Wakelands filed two petitions with the Commission: a petition to amend the comprehensive plan and a petition to amend the zoning ordinance. Both petitions sought to rezone the three lots from R-2 to their former R-4 classification. On May 18, 1995, the Commission voted to recommend that the city council deny

the requested amendments. On July 3, 1995, the city council followed that recommendation.

On October 2, 1995, the Wakelands filed a complaint for declaratory judgment, seeking a declaration that the R-2 zoning, as applied to their properties on Main Street, was unconstitutional and invalid. They also sought a declaratory judgment restoring their properties to their original R-4 classification.

During the bench trial, the Wakelands presented evidence of mixed uses within a three- or four-block area surrounding their lots. A zoning map dated March 20, 2000, illustrated the profusion of diverse uses. Buildings appeared in different colors, depending on their zoning classification, and the character of the area could change literally from one street to the next. The properties on Clark Street, only one block north of Main Street, were all zoned for a higher-intensity use than R-2. From Lincoln Avenue to McCullough Street, not one property on Clark Street was zoned as a single-family residence. The same was true of Stoughton Street, one block south of Main Street. From Lincoln Avenue to McCullough Street, all of the properties on Stoughton Street were zoned for a higher intensity of use than R-2. Main Street, consisting mostly of R-2 zoning, was sandwiched between streets of more intense zoning.

According to Lee Brown, an expert in planning and zoning who testified for the city, the city zoned West Main Street for the least intense uses while zoning adjoining blocks for increasingly intense uses as they made a transition to the commercial districts abutting railroad tracks and heavily traveled streets. April Getchius, the city's director of community development, testified that Stoughton Street's "proximity to a recreation center would provide the opportunity for multiple[-]family development along that area."

The intervenors presented photographs of the Main Street corridor, showing that it was mostly a street of Victorian and pre-World-War-I houses, with high, pillared porches, tall windows, and gabled roofs. Large, spreading trees shaded the expansive yards. There were uses on Main Street other than single-family, including a few apartment buildings and two churches; 509 West Main Street was an apartment building of 8 units, 609 West Main Street was an apartment building of 12 units, 711 West Main Street was an apartment building of 18 units, and the Wakelands' 6-unit apartment building was at 813 West Main Street. St. Patrick's Church occupied 706 and 708 West Main Street. Canaan Baptist Church was in the 400 block of West Main Street. Duplexes were at 709 and 812 West Main Street, although they were zoned as R-2. On the other lots—501, 503, 505, 506, 507, 508, 510, 511, 601, 602, 603, 604, 605, 606, 608, 705, 707, 802, 803,

804, 806, 807, 807½, 808, 809, 810, 814, and 816 West Main Street—houses were zoned as R-2. With the exception of 601 West Main Street, all of those houses and duplexes formerly were R-4, and Ordinance No. 9091—75 had down-zoned them to R-2. In addition, the ordinance down-zoned two other lots, 701 and 705½ Main Street, from R-4 to R-2.

The parties stipulated to the following uses in the five-block Main Street corridor between Lincoln Avenue and downtown: 20 single-family owner-occupied residences, 6 single-family rental residences, 1 owner-occupied duplex, 3 rented duplexes, 1 owner-occupied multifamily residence, 11 multiple-family rented properties, 1 rented rooming house, 2 vacant lots, and 5 church uses.

The Wakelands presented the testimony of a real-estate appraiser, Karen Miller, who opined that on June 29, 1999, the three lots, unimproved, were worth a total of $320,000 zoned as R-4 but were worth just $68,000 zoned as R-2. She further opined that there was little demand for single-family housing in the neighborhood and that the highest and best use of the properties was as apartment buildings.

The intervenors presented certified copies of deeds showing 19 sales of houses on West Main Street, all of them zoned R-2, from 1990 through 2000. Some of the properties had sold more than once. The intervenors also testified to the sales and renovations of houses that they had observed on Main Street. In October 1998, before they petitioned to intervene, Folk and Kangas offered to buy the three lots from the Wakelands for a total of $150,000. The Wakelands declined the offer.

On October 12, 2001, the trial court entered a written order denying the declaratory relief sought by the Wakelands. After addressing the factors in *La Salle* and *Sinclair*, the trial court concluded that the Wakelands had "failed to meet their burden of proving by clear and convincing evidence that the application of the ordinance to the particular property is unreasonable and arbitrary and bears no relation to public health, safety, morals[,] or welfare." The trial court found that the R-2 zoning of the Wakelands' lots was "clearly not an anomaly" because "this Main Street area has maintained a distinctive historical and residential character." This appeal followed.

## II. ANALYSIS

### A. Standard of Review

■ The Wakelands urge us to apply a *de novo* standard of review "because this case involves the application of law to facts that are basically uncontroverted." They have cited no zoning case in which the standard of review was *de novo*. The factors in *La Salle* and *Sin-*

*clair* call for a factual analysis. According to *La Salle*, a trial court may consider the following factors in a zoning case: (1) the uses and zoning of nearby property, (2) the extent to which the zoning restrictions diminish property values, (3) the extent to which the diminishment of the plaintiff's property values promotes the public good, (4) the gain to the public compared with the hardship to the property owner, (5) the suitability of the property to the zoned purposes, and (6) the length of time the property has been vacant as zoned in the context of land development in the area. *La Salle*, 12 Ill. 2d at 46-47, 145 N.E.2d at 69. In *Sinclair*, 19 Ill. 2d at 378, 167 N.E.2d at 411, the supreme court added two other factors: (1) the community's need for the proposed use and (2) the care with which the community has planned its land use and development.

■ When assessing "extent," "need," and "care," and weighing detriment to the property owner against benefit to the public, one does not apply the law to uncontroverted facts. One works toward a factual conclusion. In this case, the factual conclusions were controverted. The parties do not agree, for example, that the Main Street corridor is an area distinguishable, in its characteristics, from surrounding areas.

"The standard for review of zoning cases, as in other cases, is that the findings of the trial court will not be disturbed unless against the manifest weight of the evidence." *Pioneer Trust & Savings Bank v. County of Cook*, 71 Ill. 2d 510, 516-17, 377 N.E.2d 21, 24 (1978). "[A]gainst the manifest weight of the evidence" means that the opposite conclusion is clearly evident from the evidence in the record—in other words, there was plain, clear, and undisputable error in the factual findings. *In re Estate of Ferguson*, 313 Ill. App. 3d 931, 938, 730 N.E.2d 1205, 1211 (2000).

■ The Wakelands had a heavy burden in the proceedings below. It is the municipal body's prerogative to regulate the use of land within its borders, and a trial court should not gainsay such regulations unless they are arbitrary or unrelated to public health, safety, and morals. *La Salle*, 12 Ill. 2d at 46, 145 N.E.2d at 68. To ensure that it does not invade that legislative prerogative, the trial court should require the plaintiff to prove, by clear and convincing evidence, that the zoning restrictions "bear no real and substantial relation to the public health, safety, morals, comfort[,] and general welfare." *La Salle*, 12 Ill. 2d at 46, 145 N.E.2d at 69.

It is the trial court's job, not ours, to decide whether the Wakelands carried that burden of proof. If all we can say is that the opposite decision also would have been reasonable, the appellant cannot prevail. *Bank of Elk Grove v. City of Joliet*, 167 Ill. App. 3d 457, 461, 521 N.E.2d 648, 650 (1988).

## B. The *La Salle* Factors

### 1. *Uses and Zoning of Nearby Property*

■ The Wakelands point out that within 2½ blocks of their properties, there are 8 different zoning classifications beside R-2, all more intense than R-2. Within four to five blocks of their properties, five additional zoning classifications appear. A court should consider "whether the subject property is zoned in conformity with surrounding existing uses and whether those uses are uniform and established." *Tillitson v. City of Urbana*, 29 Ill. 2d 22, 28, 193 N.E.2d 1, 4 (1963).

Most of the different zoning classifications appear on streets north and south of Main Street. Main Street itself, from Lincoln Avenue in the west to McCullough Street four blocks to the east, is predominantly a corridor of old houses, as the intervenors' photographs show, and the city has zoned most of the lots along that corridor as R-2. Moreover, the Wakelands describe the very threat that the city is trying to stave off by its amended zoning ordinance: apartment buildings and commercial buildings impinging upon traditional single-family residential areas such as the Main Street corridor. A more intense use of land nearby does not necessarily determine the character of an area. For example, a residential area and commercial area can exist across the street from one another and yet be separately identifiable. *Glenview State Bank v. Village of Deerfield*, 213 Ill. App. 3d 747, 760, 572 N.E.2d 399, 408 (1991).

The question—a question of fact—is whether plaintiffs' land "largely takes its character from" the uses of the nearby land. See *Cosmopolitan National Bank of Chicago v. City of Chicago*, 27 Ill. 2d 578, 585, 190 N.E.2d 352, 356 (1963). Whether the Wakelands' three lots took their character from nearby single-family houses or from apartment buildings is a question of fact. The trial court was not required to find that multiple-family use was the defining feature of the area of Main Street where the Wakelands' lots were located. The Main Street corridor consisted mostly of old, single-family houses, 20 of which were owner-occupied.

### 2. *Diminishment of the Wakelands' Property Values*

The Wakelands presented evidence that their lots were more valuable zoned R-4 than R-2.

> "Although the second factor—the extent to which property values are diminished by the particular zoning restrictions—must be considered, it is not determinative that the property would be worth more if the zoning were reclassified because this would be true in virtually all reclassification cases." *Glenview State Bank*, 213 Ill. App. 3d at 761, 572 N.E.2d at 409.

The trial court considered this factor in its written order, and it was the trial court's prerogative to decide how much weight to give to it.

### 3. *Extent to Which the Devaluation Promotes the Public Good*

The trial court found that the down-zoning of the Wakelands' lots promoted the public good by "preserving historical continuity, limiting congestion[,] and restricting burdens on existing infrastructure."

The Wakelands object to the historical rationale. They concede that "historical and aesthetic considerations may be taken into account in passing a zoning ordinance." They argue, however, that no one presented any evidence that their two houses, or any other house on Main Street, had historical value. They note that the city has an ordinance (Urbana Zoning Ordinance, art. XII (eff. September 1999)) whereby it may designate structures as historic landmarks and impose restrictions on altering those structures. No evidence suggested that the city had so designated any of the houses on Main Street.

We are aware of no case holding that a city must designate houses on a street as historical landmarks before passing a zoning ordinance protecting the historical appearance or ambience of the street. In *City of Champaign v. Kroger Co.*, 88 Ill. App. 3d 498, 510, 410 N.E.2d 661, 670 (1980), we held that "aesthetics is an element of the public health, safety, and welfare" and that municipalities therefore could "enact zoning laws regulating, among other things, the dimensions of commercial signs." If a city can make an aesthetic judgment that large signs are undesirable in an area of commercial and residential buildings (*Kroger*, 88 Ill. App. 3d at 502-03, 410 N.E.2d at 666), we see no reason why it cannot make an aesthetic judgment that building a row of modern apartment buildings on a street of old, architecturally ornate houses is undesirable.

The R-2 zoning does not prevent someone from tearing down a Victorian house and replacing it with a prefabricated ranch house—or even from letting the Victorian house rot to the ground. The Commission never found, however, that modern houses were displacing old houses; it found that multiple-family structures, especially apartment buildings, were doing so. It further found that the encroachment of apartment buildings made owners less likely to maintain old houses because, with the ambience and tranquility of the neighborhood destroyed, they no longer wanted to live in them.

" 'A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs.' " *Kroger*, 88 Ill. App. 3d at 510, 410 N.E.2d at 670, quoting *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 39 L. Ed. 2d 797, 804, 94 S. Ct. 1536, 1541 (1974). "Density is a legitimate

concern in a zoning case and an adequate basis for classification."
*Northern Trust Bank/Lake Forest, N.A. v. County of Lake*, 311 Ill. App.
3d 332, 339, 723 N.E.2d 1269, 1276 (2000) ("proposed use would be
far more dense than the existing single-family developments on nearby
properties"), *appeal denied*, 189 Ill. 2d 661, 731 N.E.2d 765 (2000).
The trial court reasonably found that the Wakelands' "immediate
neighbors have a substantial interest in avoiding the loss of open
space, the congested streets, increased noise[,] and inadequate parking
that go with greater density of development."

The Wakelands argue that because their lots are next to Lincoln
Avenue, a busy thoroughfare, the lots are an appropriate location for
an apartment building. Nevertheless, the lots are east of Lincoln
Avenue. The trial court could reasonably have found that the character
of Main Street changes west of Lincoln Avenue, where the university's
property begins, whereas east of Lincoln Avenue, Main Street becomes
a quiet, single-family residential neighborhood.

*4. Gain to the Public Compared With Hardship to the Wakelands*

Citing *Industrial National Mortgage Co. v. City of Chicago*, 95 Ill.
App. 3d 666, 420 N.E.2d 581 (1981), and *Harris Trust & Savings
Bank v. Duggan*, 95 Ill. 2d 516, 449 N.E.2d 69 (1983), the Wakelands
argue that their "reliance on the R-4 zoning and on the enterprise[-]
zone benefits when they acquired the properties impacts heavily on
the gain[-]versus[-]hardship consideration." Apparently enterprise-
zone benefits are still available.

Generally, there is no vested right in the continuation of a zoning
classification. *County of Kendall v. Aurora National Bank Trust No.
1107*, 219 Ill. App. 3d 841, 848, 579 N.E.2d 1283, 1287 (1991). The
supreme court has held, however:

> " '*** [W]here there has been a substantial change of position,
> expenditures[,] or incurrence of obligations made in good faith by
> an innocent party under a building permit or in reliance upon the
> probability of its issuance, such party has a vested property right[,]
> and he may complete the construction and use the premises for the
> purposes originally authorized, irrespective of subsequent zoning
> or a change in zoning classifications.' " *Pioneer Trust*, 71 Ill. 2d at
> 522-23, 377 N.E.2d at 26, quoting *People ex rel. Skokie Town House
> Builders, Inc. v. Village of Morton Grove*, 16 Ill. 2d 183, 191, 157
> N.E.2d 33, 37 (1959).

See also *Industrial National Mortgage*, 95 Ill. App. 3d at 670-71, 420
N.E.2d at 585.

Usually, the issuance of a building permit presupposes that one
will begin construction soon. To act in good-faith reliance on a build-
ing permit or on the probability of its issuance, one cannot buy the

land and let it sit unaltered for two years without doing anything preliminary to development. One must begin the planned development with reasonable promptness rather than merely hold the land for "inventory" or "investment purposes." In *Harris Trust*, 95 Ill. 2d at 520-21, 449 N.E.2d at 71, for example, the plaintiff applied for demolition permits within three months after entering into a contract to sell the property—a contract that was contingent on the purchaser's right to develop the property in accordance with its current zoning classification. The city granted the permits but revoked them the next day on the ground that it was considering designating the property as a landmark. The appellate court held that "[t]he down-zoning precluded the negotiated land sale, substantially reduced the value of the property, and impedes [the plaintiff's] fiduciary responsibilities as to its charitable obligations." *Harris Trust*, 95 Ill. 2d at 532, 449 N.E.2d at 76. In *Industrial National Mortgage*, 95 Ill. App. 3d at 671, 420 N.E.2d at 585, the plaintiffs took out loans for construction and installed a sewer and median, which were necessary for the apartment buildings they intended to build. It does not appear that the Wakelands took any comparable action in reliance, other than buying the land.

In the present case, the city created the interim development district, prohibiting multiple-family residential development, more than two years after the Wakelands bought the lots. During those two years, the Wakelands did not begin constructing the apartments or do anything in anticipation of construction. They did not apply for a building permit or even draw up plans for the apartment buildings.

Generally, one cannot reasonably rely on the indefinite continuation of a zoning classification. Like any legislation, zoning ordinances can be amended, and one buys land with that understanding.

> "Although property owners have a right to rely upon the classification of their property and know that the classification will not be changed unless required for the public good, they also acquired their property knowing that amendments could be made to the ordinance within the limits of the law." *Thompson v. Cook County Zoning Board of Appeals*, 96 Ill. App. 3d 561, 577, 421 N.E.2d 285, 298 (1981).

To come within the rule of *Pioneer Trust, Industrial National Mortgage*, and similar cases, the buyer must take action to develop the property within a reasonable time or else a city's right to amend its zoning ordinance in response to changing conditions would be greatly impaired.

### 5. *Suitability of the Property to the Zoned Purposes*

As the certified copies of deeds showed, houses on Main Street,

zoned as R-2, were selling briskly. Folk and Kangas offered to buy the lots from the Wakelands after the city down-zoned them. The trial court reasonably found that the lots were suitable for single-family residential use.

### 6. *Length of Time the Subject Property Has Been Vacant*

Zoned as R-2, the houses have not been vacant. Renters continuously occupied the houses at 807½ and 809 West Main Street until the time of trial. Renters occupied the house at 811 West Main Street until it burned down. The trial court reasonably found that the vacancy of that parcel was due to the Wakelands' choice rather than to the change in zoning classification. Under the R-2 zoning classification, the properties can generate a steady stream of income.

## C. *Sinclair* Factors

### 1. *Care With Which the City Has Planned Its Land Use*

The Wakelands argue that the city decided to down-zone their property without carefully planning land use. They point out that for 40 or 50 years, the city's comprehensive plan and zoning ordinance allowed multiple-family residential uses in the area of the Wakelands' properties. Nevertheless, the city's duty of care did not require continuation of the zoning classification for another half century, regardless of changes in conditions. After much study and many public meetings, the city determined that a continued uncontrolled proliferation of apartment buildings in the study area would change the area's character in a way detrimental to the public good. The "Downtown to Campus Plan" was a detailed document, setting forth a reasoned basis for the Commission's recommendations, with an abundance of maps and supporting data. The city adopted the "Downtown to Campus Plan" after no less than 30 public hearings and, with few exceptions, followed the plan.

The Wakelands fault the city for allowing some properties on Main, Stoughton, and Clark Streets to retain their R-4 classifications (contrary to the Commission's recommendations) while down-zoning other properties, such as theirs, to R-2. They also point out that if St. Patrick's Church and Canaan Baptist Church ceased being churches and someone bought them, the new owner could demolish the church buildings and replace them with apartment buildings, since the church buildings stand on lots zoned as R-4.

A court should consider "surrounding existing uses" (*Tillitson*, 29 Ill. 2d at 28, 193 N.E.2d at 4), and the trial court could reasonably have found that the uses on Main Street were different from those on Stoughton and Clark Streets. Of the 50 properties in the Main Street

corridor, 20 were single-family owner-occupied dwellings. Over half of the dwellings on Clark and Stoughton Streets were single-family, but there appears to be no evidence that they were predominantly owner-occupied. Smith testified that his five houses on Stoughton Street had as many as four student renters apiece.

Getchius testified that "the focus of the Main Street corridor was *** the nature of the housing stock, the historical large homes *** as well as the ambience of other features like trees[ ] and brick streets and sidewalks." There appears to be no evidence that the houses on Clark and Stoughton Streets had historical significance or that those streets had a comparable "ambience."

No one explained why the city zoned the church buildings as R-4. Even if planning were flawed in that respect, it does not follow that the trial court's judgment was against the manifest weight of the evidence. Ordinance No. 9091—75 rezoned a total of 203 properties. The city down-zoned every house in the Main Street corridor, not just the Wakelands'. By attacking a handful of reclassifications, the Wakelands do not prove, by clear and convincing evidence, that the ordinance as a whole was poorly planned.

The Wakelands complain that the city did not consider their properties individually. Robert Gleissner, the city planner, testified that he did not apply the *La Salle* factors lot by lot, but he explained why. The Commission considered the properties "group by group" and not in isolation from one another, "keeping in mind that the plan itself focuses on the entire neighborhood and not [on] separate portions of the neighborhood." By saying that he did not consider lots individually, Gleissner could be understood as saying that he looked for patterns of land use.

### 2. Community Need for More Apartment Buildings

The parties agree that university students and employees need more apartments. However, the trial court also found that the city needed single-family housing and duplexes and that too many apartment buildings nearby can disturb quiet residential neighborhoods.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

McCULLOUGH, P.J., and KNECHT, J., concur.