FIRST NATIONAL BANK OF HIGHLAND PARK, Trustee, *et al.*, Plaintiffs-Appellants, *v.* THE VILLAGE OF VERNON HILLS, Defendant-Appellee.

Second District   No. 76-66

Opinion filed December 30, 1977.

986

M. R. Conzelman, of Waukegan, for appellants.

Russell L. Engber, of Highland Park, for appellee.

Mr. JUSTICE GUILD delivered the opinion of the court:

This appeal involves a challenge to the constitutionality of the zoning ordinance of the Village of Vernon Hills as applied to a 50-acre parcel of vacant property which is currently zoned B-2 (Industrial). Plaintiff First National Bank of Highland Park is the record owner of the property in question as trustee under a land trust. Co-plaintiff Ensign Investment Corporation has an option to buy the subject property and proposes to erect thereon 738 multiple-family dwelling units. After the village denied plaintiffs' request for R-5 (Multiple-family) zoning, and a height variation allowing the construction of six story buildings, this declaratory judgment action was filed. The trial court entered an order upholding the validity of the village zoning ordinances on September 23, 1975, and plaintiffs appeal.

We have included herein a map showing the 50-acre parcel which is the subject of this lawsuit in the center and which also identifies the surrounding land uses. The Landmaster property to the north of the subject site is zoned to allow the development of B-1 (Commercial) usages but is apparently still vacant. There is to be an easement across the Landmaster property giving the subject site access to Illinois Route 60. The New Century Town planned unit development (PUD) contains a number of different land uses. The portion of New Century Town generally north of the subject site is planned to include some industrial or office and research buildings along Butterfield Road. The rest of that area will be devoted to multiple-family dwellings and open space. Hawthorne Shopping Center is located on the corner of Route 60 and Milwaukee Avenue. The testimony herein indicates that buildings 8 to 15 stories in height are permitted in various parts of New Century Town, but does not indicate where such buildings are to be located.

The portion of the Deerpath PUD which is adjacent to the subject site is planned to include both commercial areas and townhouses. Other areas of townhouses and condominiums are planned for the development as well as a substantial number of single-family homes. The developers of Deerpath have constructed at least some of the single-family homes, but the record does not clearly reveal whether any of the townhouses or condominiums have been built. All of the proposed residential sections of the MIL-60 PUD are to be developed with high-density (60 dwelling units per acre) multiple-family housing. MIL-60 also includes 128 acres of commercial and commercial/industrial uses and 270 acres designated for industrial development. The same types of uses allowed under B-2 zoning

are allowed in the 270-acre industrial section. Buildings of 8 stories are allowed in the residential sections of MIL-60 and buildings of 12 stories in the commercial and industrial areas. No development had occurred in MIL-60 at the time of the trial herein in 1975. There is conflicting testimony in the record but there are apparently a number of four-family multiple dwellings existing in the R-5 area of Plymouth Farms. The triangular portion of Plymouth Farms which adjoins the Soo Line Railroad tracks and is zoned B-2 is currently vacant. The triangular piece of property west of the subject site which is also zoned B-2 is owned by the plaintiff bank under the same trust agreement as the subject site and is vacant. The railroad is located approximately 225 feet west of the subject site at the nearest point.

The three industrial parks in the area are all in the Village of Mundelein. Butterfield 60, which is across the railroad tracks from the subject site, contains approximately 125 acres. It was started in the early 1960s but approximately two-thirds of it is still undeveloped. The record herein is not entirely clear upon this point, but there were apparently two sales of property in that park during 1973. Thereafter at least one building was started, but it was vacant at the time of the trial herein. The area which we have designated Mundelein Industrial Area on the map contains a number of usages, including a storage yard for builders and contractors supplies and a glass factory in the area immediately north of Route 60. The portion of this area directly south of Alanson Road contains the Mundelein Industrial Park, consisting of approximately 100 acres and which is 20-30% developed. The Alanson Industrial Park is approximately 160 acres in size. There were apparently two sales of property in the Alanson Park during 1974 or 1975, but only 35-40% of the park is developed.

As may be expected in cases of this nature, the testimony adduced at trial was conflicting in many respects. Plaintiffs presented three witnesses who testified that the highest and best use of the subject property would be for a multiple-family development of the type proposed by plaintiffs. The village's witnesses, on the other hand, were of the opinion that the highest and best use of the property would be as an industrial park in its current zoning classification. The testimony of plaintiffs' witnesses also indicates that, in their opinion, the subject property is worth approximately $10-12,000 more per acre with multiple-family zoning than with the present industrial zoning. The village's appraisal witness, however, was of the opinion that the property was worth approximately the same amount whether it was zoned for multiple-family or industrial development. The village witnesses all stessed the point that the subject site, together with the triangular piece of property immediately west thereof and the one triangular section of Plymouth Farms which is currently undeveloped, are the only sites other than those in MIL-60

which allow for the development of industry in the village. With regard to the three existing industrial parks in Mundelein and their effect upon the suitability of the subject site for industrial development, the village witnesses felt that the subject property could reasonably be deemed a part of a general industrial corridor adjoining the Soo Line Railroad. One of the village witnesses also testified that there were approximately 400 acres of industrial parks in the Village of Mundelein whereas, excluding the property owned by plaintiff Bank and that in Plymouth Farms, Vernon Hills had only approximately 270 acres of possible industrial sites in MIL-60. Vernon Hills was projected to have a greater population than Mundelein and, therefore, the village witness felt that Vernon Hills could support at least as much industry as Mundelein. He particularly stressed the fact that the MIL-60 industrial sites would not have rail access whereas the subject property, considered with the property immediately to the west which is also owned by the plaintiff Bank, and the Plymouth Farms triangle do have rail access. Plaintiffs' witnesses testified, however, that there was a general lack of development in the three industrial parks in Mundelein and stressed the fact that there was much vacant land available in those parks as well as elsewhere for industry. They were of the opinion that there was no particular need for the Village of Vernon Hills to have zoning classifications for all types of uses and, therefore, the fact that the village would be losing part of its B-2 (Industrial) zoning was not particularly important to it. Plaintiffs' witnesses saw Vernon Hills as basically a residential community. They testified that residential development was progressing, sales and rentals in the area were good, and that there was a strong demand for multiple-family housing. The defendant's witnesses stressed the point that the village had already approved some 10,000 dwelling units, most of which were to be multiple-family dwellings but most of which had not yet been built. They felt that there was no real need for an additional 738 multiple-family dwelling units.

The witnesses also conflicted in their assessment of the adequacy of access from the subject property to Route 60. The only definite access to the subject property is to be via the easement across the Landmaster property to the north. The village witnesses thought that this would be adequate for an industrial development. Plaintiffs' witnesses, however, were of the opinion that direct access to a major thoroughfare is required to establish a successful industrial park and that it would be impossible to do so on the subject property because it was set back off Route 60.

The beneficiary of the land trust which holds title to the property testified that he had been unable to sell it. He testified that over the years he had owned the property he had signed a number of short-term listing agreements with brokers. His own involvement in actually developing

industrial property had been in the Butterfield 60 Industrial Park in Mundelein, which he viewed as being unsuccessful. The beneficiary's testimony with regard to specific attempts to sell the subject property or develop it with industrial uses was somewhat vague and it is difficult to tell when the attempts occurred. Other testimony indicates that the plaintiffs' proposed development would yield net benefits to the local school districts in excess of $200,000 per year. However, the testimony also indicates that the net benefits to the school districts from an industrial development would be higher than from a multiple-family development.

We turn now to the first issue raised by the plaintiffs herein. They take the position that, because the Village of Vernon Hills admittedly had no comprehensive plan at the relevant times herein, the traditional presumption of validity of its zoning ordinances is weakened and that, indeed, there should be no such presumption in this case. They base their argument solely upon *Forestview Homeowners Association, Inc. v. County of Cook* (1974), 18 Ill. App. 3d 230, 309 N.E.2d 763. With regard to this particular issue, we deem the history of the village's development important. The village was apparently formed in the late 1950s or the very early 1960s and consisted basically of vacant land and a residential area which is a substantial distance south and west of the subject property. The first zoning ordinance was adopted in 1961 and was what is known as a inclusive zoning ordinance. Under such an ordinance single-family homes are viewed as the highest use of property whereas industrial uses are at the bottom. Commercial uses and multiple-family housing are in between. Under an inclusive ordinance anyone who has industrial zoning is allowed to build not only the specific uses listed for that classification but also any use permitted in any higher classification, *i.e.,* multiple- or single-family housing. In 1961 the subject property was classified in the B-2 zone, which would have allowed a development such as now proposed because of the inclusive nature of the zoning ordinance. In 1969 the village comprehensively amended the zoning ordinances in all respects and changed from an inclusive to an exclusive zoning ordinance. Under the exclusive zoning ordinance only the specific uses listed in the zoning ordinance are allowed within the various designated areas. The subject property was maintained in the B-2 (Industrial) classification. Because of the change from an inclusive to an exclusive type zoning ordinance only industrial development was to be allowed on the subject property. At all relevant times herein the subject property has remained vacant regardless of the types of development permitted under the applicable zoning. Vernon Hills remained a relatively small residential community until the 1970s when the village began to develop; various PUDs were proposed and annexed and construction began on Hawthorne Shopping Center, which apparently was not yet finished at the time of the trial

herein in 1975. The testimony also indicates that the Village engaged a planning firm in 1973 to prepare a comprehensive plan. The firm did so but the village did not ever adopt that plan. The services of the planning firm were terminated in early 1975. However, at the time of the trial herein several months later, the village was in the process of holding hearings on the adoption of a comprehensive plan.

Thus, we have a situation before us in which there was a relatively long period during which the village experienced little in the way of development or growth, followed by a short period in which substantial growth and development began to take place. From the state of the record herein it would appear that the extent of planning engaged in by the village officials was commensurate with the level of developmental activity in the village. First, the village switched from an inclusive zoning ordinance to a more restrictive exclusive ordinance. Later, when it became apparent that expert advice with regard to land use planning would be useful, the village engaged a planning firm. We find this situation totally distinguishable from that discussed in *Forestview Homeowners Association, Inc. v. County of Cook.* There, although the court specifically noted the lack of any comprehensive plan for the development of the unincorporated areas of Cook County, they also pointed out that the county officials had apparently made no use whatsoever of much available relevant data with regard to the impact of the proposed development on the school, highway, water and other resources of the area. In the case before us there is no indication whatsoever that the village officials did not consider all of the available relevant data. Therefore, the essential argument of plaintiffs on this issue is that because the village has no particular piece of paper denominated a comprehensive plan we should ignore their legislative judgments. We find that argument to be without merit. We do not believe that the court in *Forestview* intended that such significance should be attached to the existence or nonexistence of a piece of paper. We specifically decline to do so. We believe that the truly important consideration in this regard is whether the community in question has given care and consideration to the use and development of the land within its boundaries. The fact that a community has adopted a comprehensive plan is indicative of such care, but the mere fact that a relatively new community has not yet adopted such a plan does not mean that it did not exercise care and planning with regard to its development.

■■ With respect to this issue as well as the substantive issue herein, the plaintiffs have placed heavy reliance upon the fact that a member of the planning firm which was under contract to the village gave testimony which generally favored plaintiffs' proposal. In between September 1973 when the planning and zoning commission recommended that plaintiffs'

petition for rezoning be denied, and June 1974 when the village Board of Trustees acted upon the recommendation the planning firm wrote a memorandum to the village discussing a total of 10 different proposed developments in and around the village. That memorandum specifically noted that there were several flaws in plaintiffs' plan and concluded that a complete redesign would be necessary. In January 1974 the planning firm forwarded their memorandum to one of the village trustees with a cover letter. In that particular letter the witness who later testified on behalf of plaintiffs concluded that the subject property could not be economically used for industry because of its location and that multiple-family uses would be appropriate for it. The letter noted, however, that the planning firm was withholding judgment on the preliminary plan presented by the plaintiffs. While we agree with plaintiffs that the opinions of an expert witness such as this who is thoroughly familiar with the area in question are valuable, we do not believe that they are in any way binding upon the village or conclusive of the issue herein. Specifically we note that in the adoption of comprehensive plans our statutes envision input from the public on at least two levels. First, the comprehensive plan must be submitted to the planning commission (Ill. Rev. Stat. 1975, ch. 24, par. 11—12—7) composed to members of the community (Ill. Rev. Stat. 1975, ch. 24, par. 11—12—4). Thereafter public hearings are required. (Ill. Rev. Stat. 1975, ch. 24, par. 11—12—7.) Even then the corporate authorities are not obligated to adopt the comprehensive plan as presented but may adopt it in part or reject the entire plan. In addition to the fact that the village can in no way be considered bound by the opinion of the particular witness, we note that the opinion as given was not an unqualified recommendation of plaintiffs' plan. For the reasons stated we find no merit in plaintiffs' contention that the zoning ordinances herein are not entitled to the traditional presumption of validity.

We turn now to the substantive issue of whether the B-1 zoning of plaintiffs' property bears any substantial relationship to the public health, safety, morals or general welfare. The factors to be considered in determining the validity of any zoning ordinances are well established and we will not repeat them here. (See, *e.g., Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 180-81, 354 N.E.2d 899, 903.) It has also been repeatedly observed that in cases such as this it is the duty of the trial court to evaluate the credibility of the witnesses and weigh their conflicting testimony. The findings of the trial court will not be reversed unless they are contrary to the manifest weight of the evidence. *Tomasek v. City of Des Plaines; Wheeling Trust & Savings Bank v. County of Lake* (1975), 31 Ill. App. 3d 636, 642, 333 N.E.2d 705, 710.

■■■ A review of the record herein convinces us that the trial court's holding that plaintiffs have failed to sustain their burden of proof is not

against the manifest weight of the evidence. The evidence shows that there are both industrial and residential uses close to the subject property. As such this property might reasonably be classified within either an industrial or residential classification. The proximity of the railroad tracks, which are only approximately 225 feet away from the subject property at the nearest point, is a factor weighing heavily in favor of the industrial classification. The testimony from the beneficial owner of the property to the effect that his plans prohibited him from granting any access from the subject property to the railroad but giving no explanation for why this was so does not convince us that the factor of nearness to the railroad should be disregarded in evaluating the industrial potential of the subject site. Rather, it appears that the railroad is a rather unique resource which is, in many instances, conducive to industrial development and that the village officials are acting reasonably in preserving the remaining areas near this resource for industrial development. Plaintiffs have, however, argued vigorously that the common ownership of the subject property and the triangular portion abutting the railroad tracks must be disregarded and the subject property considered by itself because that was the only property which the plaintiffs applied to have rezoned. We deem this position untenable. We do not believe a landowner should be allowed to control the decisions of the municipal authorities merely by virtue of where he arbitrarily decides to draw lines upon his unsubdivided property. Further, in this case we believe the municipality's concern for the triangular parcel abutting the railroad tracks is indicative of its general concern with the orderly development of the village. While the existence of apparently large amounts of vacant industrial property in this area does tend to support plaintiffs' position that there is no demand for more industry, we deem the evidence herein to be far short of a clear and convincing showing that such is the case. Part of the testimony herein indicates that in recent years financial conditions which adversely affect industrial developments have been prevalent. Nonetheless, the record shows that there have been at least some sales of industrial property and some development in the nearby industrial parks. There is nothing herein to indicate that these industrial parks are not progressing at what is a normal and satisfactory rate. The experts herein made no attempt to compare the rate of development in this particular area to that elsewhere.

We have also taken note of plaintiffs' argument that the village has discriminated against plaintiffs because it has granted every request to build multiple-family dwellings but theirs. The record herein does not support plaintiffs' contention. It appears to us that most of the rezoning to which plaintiffs refer was accomplished by virtue of the annexation of large portions of territory to the village. The developers of these areas proposed various uses, including some multiple-family residential areas,

and the village eventually agreed to the proposals. The Deerpath development, which will contain both multiple-family and single-family residential areas, was also a coordinated scheme of development for a large piece of property. It does not automatically follow that because multiple-family residential uses were appropriate in other areas that such uses are also appropriate on the subject property. It is readily apparent that all of the areas to which plaintiffs seem to be comparing themselves are substantially larger and that none of them have any possibility of access to the railroad whereas the subject property does. In view of these differences we cannot say that the village's denial of plaintiffs' request for rezoning is merely the result of discrimination against plaintiffs.

In summary, it appears to us that this is a rather close case in terms of the proper zoning to be applied to the subject property. From our reading of the cold record herein certain testimony offered on behalf of both parties appears rather unconvincing. We cannot say that the trial court's resolution of the issues herein was not the result of its conclusions as to the credibility of the witnesses; neither can we say that the judgment is contrary to the manifest weight of the evidence.

In view of our conclusion that the trial court's ruling as to the validity of the zoning ordinances must be affirmed, we find it unnecessary to discuss the other issues raised by the plaintiffs herein. We specifically decline to discuss the issue concerning the standing of plaintiff Ensign to contest the validity of the zoning ordinance. It is clear that the plaintiff bank had standing in both the trial and this court and we deem it immaterial to the resolution of this case whether the court properly had one or two plaintiffs before it. The judgment of the trial court is affirmed.

Affirmed.

SEIDENFELD and RECHENMACHER, JJ., concur.