1350 LAKE SHORE ASSOCIATES, Plaintiff-Appellant, v. DENISE M. CASALINO, Commissioner, The Department of Planning and Development of the City of Chicago, *et al.*, Defendants-Appellees (Edward T. Joyce *et al.*, Intervenors-Appellees).

First District (3rd Division)   No. 1—03—1248

Opinion filed September 1, 2004.

Piper Rudnick, L.L.P., of Chicago (Thomas F. Gesebracht and Kenneth L. Schmetterer, of counsel), for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Kerri Maloney Laytin, Assistant Corporation Counsel, of counsel), for appellees Denise M. Casalino and City of Chicago.

Hedlund & Hanley, L.L.C., of Chicago (Reuben L. Hedlund, James W. Joseph, and Erin H. Walz, of counsel), for other appellees.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, 1350 Lake Shore Associates (LSA), appeals from a circuit court order entered following a bench trial, granting judgment in favor of the defendant, the City of Chicago, and the intervenors to this action on count III of LSA's fourth-amended complaint. At issue before the court was the constitutionality of a down-zoning ordinance and subsequent height limitation ordinances that LSA claimed affected its right to construct a high-rise apartment building on its lakefront property. The circuit court ruled that the ordinances are

constitutionally valid as applied to the subject property, and for the reasons that follow, we affirm.

This case is before us for the third time on appeal. As a consequence, we will recite only the procedural history and facts necessary to understand the issues presented in the instant appeal.

At all times relevant to this appeal, LSA owned the property located at 1320-30 Lake Shore Drive (the property). On November 14, 1978, the Chicago city council approved LSA's application to change the property's zoning from an "R8 General Residence District" classification to "Residential Planned Development 196" (RPD 196), thereby permitting the construction of a 40-story, 196-unit apartment building on the property. It was not until sometime in 1996 that LSA began investigating the possibility of developing the property in accordance with RPD 196. On December 11, 1997, LSA's project architect submitted plans (Part II Submittal) to the Department of Planning and Development of the City of Chicago (Department of Planning), seeking the issuance of a Part II Approval letter, which is a prerequisite to a zoning certificate and which, in turn, is a prerequisite to the issuance of a building permit. The commissioner of the Department of Planning, however, took no action on LSA's Part II Submittal. On April 29, 1998, the Chicago city council approved an ordinance (hereinafter referred to as the "down-zoning ordinance") which changed the property's zoning from RPD 196 to an "R6 General Residence District," under which LSA's proposed building was not a permitted use.

The Chicago city council later passed two ordinances (hereinafter referred to as the "height limitation ordinances") that imposed height limitations on any new construction in the area in which the property was located. Specifically, on January 20, 1999, an ordinance creating the Near North Historic Areas I and II was enacted. This ordinance imposed a 125-foot height limitation on any new construction located in these areas. On July 21, 1999, an ordinance was enacted that imposed height limits depending on the underlying zoning classification. For property located in an R6 zoning district, the height limitation is 90 feet or 8 stories, whichever is greater.

LSA filed its initial complaint in this action on August 25, 1998, naming as defendants the commissioner of the Department of Planning (Commissioner) and the City of Chicago (City) (hereinafter referred to collectively as the City defendants). Subsequently, Edward T. Joyce, Carl Hunter, John Stassen, John C. Mullen, Clark W. Fetridge, Respicio F. Vasquez, and Bernard J. Miller (hereinafter referred to collectively as the intervenors), all of whom own property located within 250 feet of the subject property, were granted leave to intervene.

LSA amended its original three-count complaint numerous times during the proceeding. In count I of its first-amended complaint, LSA sought a writ of *mandamus* directing the Commissioner to issue it a Part II Approval letter. Count II sought a declaration that the down-zoning ordinance does not affect LSA's right to develop the property in conformity with RPD 196 and an injunction barring the City from enforcing the down-zoning ordinance against it. Count III sought a declaration that the down-zoning ordinance is void. The circuit court later granted LSA's motion to voluntarily dismiss count II.

The circuit court conducted separate bench trials on counts I and III of LSA's amended complaint. On March 9, 2000, following the trial on count I, the court entered judgment in favor of the City defendants and the intervenors, thereby denying LSA's request for a writ of *mandamus* directing the Commissioner to issue it a Part II Approval. On appeal, we reversed the court's judgment and remanded the case to the circuit court with directions that it issue a writ of *mandamus* requiring the Commissioner to issue a Part II Approval to LSA. *1350 Lake Shore Associates v. Hill*, 326 Ill. App. 3d 788, 761 N.E.2d 760 (2001) (hereinafter referred to as *Lake Shore I*).

On remand, LSA filed a "Motion for Entry of Final Judgment Order" in which it requested that the circuit court enter orders: (1) requiring the Commissioner to issue it a Part II Approval; (2) requiring the zoning administrator, upon receipt of the Part II Approval, to issue a zoning certificate; and (3) "enjoining the City and its agents from enforcing the provisions of the Chicago Zoning Ordinance insofar as any portion of that ordinance prevents [LSA] from any right to which it may be entitled by virtue of its Part II Approval and zoning certificate, including the right to have a building permit application processed without reference to the down-zoning ordinance that became effective in May, 1998." Thereafter, the intervenors filed a motion for a declaratory judgment, seeking a declaration that LSA is entitled to neither a zoning certificate nor a building permit in connection with the plans for which this court ordered that a Part II Approval be issued.

On March 12, 2002, the circuit court: (1) directed the Commissioner to issue a Part II Approval; (2) denied LSA's requests for orders requiring the zoning administrator to issue it a zoning certificate and prohibiting the City and its agents from applying any provision of the Chicago Zoning Ordinance which would prevent it from exercising "any right to which it may be entitled by virtue of its Part II Approval and zoning certificate, including the right to have a building permit application processed without reference to the down-zoning ordinance"; and (3) granted the intervenors' motion for a declaratory

judgment. Thereafter, LSA filed a motion for reconsideration of the circuit court's March 12, 2002, ruling and a motion requesting findings pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) (hereinafter referred to as Rule 304(a)). On May 31, 2002, the circuit court denied LSA's motion for reconsideration and granted its request for Rule 304(a) findings. In its order, the court found that LSA had not made substantial expenditures in good-faith reliance on the issuance of a Part II Approval. On June 10, 2002, LSA timely appealed the circuit court's order of May 31, 2002.

On August 12, 2002, while the judgment entered on count I of LSA's amended complaint was being appealed, LSA filed its fourth-amended complaint containing three counts. Count I appears to be nothing more than a restatement of count I contained in LSA's third-amended complaint for purposes of preserving the claim on appeal.[1] See *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150, 154, 449 N.E.2d 125 (1983) (an amended complaint must replead or incorporate by reference a claim raised in a prior complaint in order to preserve that claim on appeal). In the place of count II, LSA indicated that the claim had been voluntarily dismissed on September 1, 1999. Count III sought a declaration that both the downzoning ordinance and the height limitation ordinances are void as arbitrary and capricious and because they place an undue burden on LSA's property rights. Commencing on November 4, 2002, the circuit court conducted a bench trial on count III of LSA's fourth-amended complaint.

On April 22, 2003, after hearing extensive testimony by the parties, the circuit court issued a written memorandum opinion and order in which it entered judgment in favor of the City and the intervenors on count III of LSA's fourth-amended complaint, finding that the challenged ordinances are constitutionally valid as applied to the property. On April 28, 2003, LSA filed the instant appeal from that judgment.

On May 21, 2003, after LSA filed the instant appeal, we rendered our decision with respect to the circuit court's order of May 31, 2002. In that decision, we: (1) affirmed the portion of the circuit court's order denying LSA's request for an order requiring the zoning administrator to issue a zoning certificate; and (2) reversed those portions of the court's order denying LSA's request for an order enjoining the City and its agents from applying any provision of the Chicago

---

[1] The record before us does not contain a copy of LSA's first or subsequent amended complaints; only its fourth-amended complaint is included in the record on appeal.

Zoning Ordinance that would prevent it from developing the property in accordance with the terms of RPD 196, and granting the intervenors' motion for a declaratory judgment. Finally, we remanded the cause to the circuit court with directions that it make specific factual findings with respect to LSA's vested rights claim. *1350 Lake Shore Associates v. Mazur-Berg*, 339 Ill. App. 3d 618, 791 N.E.2d 60 (2003) (hereinafter referred to as *Lake Shore II*).

In this appeal, LSA contends that the circuit court's April 22, 2003, ruling that the challenged ordinances are constitutionally valid as applied to the property is against the manifest weight of the evidence. However, before addressing the specific arguments raised by LSA, we must address a preliminary matter raised by the intervenors. The intervenors argue, as they did in a motion to dismiss before this court, that the April 22, 2003, order is not appealable and, as a consequence, the appeal must be dismissed for lack of jurisdiction.

The intervenors argued in their motion to dismiss that, in the absence of a Rule 304(a) finding, we lack jurisdiction because, after LSA filed its notice of appeal with respect to the judgment entered on count III, we reversed the judgment entered on count I and remanded the matter to the circuit court. Relying on the portion of Supreme Court Rule 301 (155 Ill. 2d R. 301 (hereinafter referred to as Rule 301)) which states that "[a]n appeal is a continuation of the proceeding," the intervenors claimed that our reversal of the judgment entered on count I "negated whatever finality that judgment had." We rejected the intervenors' argument in this regard and denied their motion to dismiss. In *Illinois Founders Insurance Co. v. Guidish*, 248 Ill. App. 3d 116, 120, 618 N.E.2d 436 (1993), we noted that, although Rule 301 provides that an appeal is a continuation of the proceeding, "nowhere does it provide that the prosecution of an appeal renders a final judgment nonfinal pending the disposition of the appeal. The pendency of an appeal has no effect on the finality of the order appealed from." Because we had yet to reverse the circuit court's judgment on count I at the time judgment was entered on count III, the judgment entered on count III disposed of the last remaining claim and was, therefore, appealable under Rule 301.

The intervenors also argued in their motion to dismiss that, although counts I and III were "severed" by the circuit court, a Rule 304(a) finding was necessary to appeal from the judgment entered on count III because, as the supreme court held in *Carter v. Chicago & Illinois Midland Ry. Co.*, 119 Ill. 2d 296, 518 N.E.2d 1031 (1988), such a finding is required if the circuit court does not clearly and unequivocally state in its order that the severed claim shall proceed thereafter separate from the other claims. However, regardless of whether the

circuit court merely severed counts I and III for purposes of trial or ordered the claims to proceed as separate actions, we rejected the intervenors' argument in this regard for the same reason that we rejected their first argument. At the time the circuit court entered judgment on count III of LSA's fourth-amended complaint, judgment on count I had already been entered.

In their brief on appeal, the intervenors argue for the first time that we lack jurisdiction over the instant appeal because the circuit court never ruled on their amended counterclaim when it entered judgment on count III of LSA's fourth-amended complaint. Again, we disagree.

The record shows that, on May 29, 2002, the intervenors filed their amended counterclaim for declaratory judgment, seeking a finding that the challenged ordinances are constitutionally valid on their face and as applied to the property. LSA filed its answer to the intervenors' amended counterclaim on June 14, 2002. During the course of trial, on January 31, 2003, the intervenors filed a motion seeking judgment on their amended counterclaim, wherein they argued that LSA did not make a facial challenge to the height limitation ordinances, but rather, merely challenged the constitutionality of the ordinances as applied to the property. As a consequence, the intervenors sought a declaration that the height limitation ordinances are "valid, enforceable and permissible on [their] face under Art I, Section 2 of the Illinois Constitution." After LSA rested its case at trial, the intervenors presented their motion seeking judgment on their counterclaim. The trial judge, however, responded that she would "enter and continue" the motion. The record reveals no express ruling on the counterclaim or the motion. Nor does the circuit court's written memorandum opinion and order reflect a ruling thereon.

The intervenors now argue that, because their amended counterclaim and subsequent motion seeking judgment thereon were never ruled upon by the court, judgment was entered on fewer than all the claims and, therefore, a finding pursuant to Rule 304(a) was necessary in order to render the court's order of April 22, 2003, appealable. LSA responds that, once the circuit court entered judgment in favor of the City and intervenors on count III of LSA's amended complaint, "[t]here was nothing left for the trial court to do on [LSA's] claims or [the] intervenors' counterclaim, explaining why [the] intervenors—in the nine months that have passed since the trial court entered its judgment—still has [sic] not asked the trial court for some further ruling."

Neither party has included the relevant case law necessary to decide the precise issue before us; namely, the effect of a defendant's

pending counterclaim on the appealability of a judgment entered on a plaintiff's underlying complaint. Our independent research, however, has revealed *Lynch Imports, Ltd. v. Frey*, 200 Ill. App. 3d 781, 558 N.E.2d 484 (1990), a case that is instructive on the issue at hand.

In *Lynch Imports, Ltd.*, the circuit court entered summary judgment in favor of the plaintiff on his complaint seeking to recover the purchase price of an automobile. The court, however, failed to rule on the defendants' pending counterclaim, which sought damages resulting from the plaintiff's alleged failure to deliver an "acceptable" car. On appeal, this court considered, *sua sponte*, the question of whether we had jurisdiction over the appeal given that the counterclaim was never ruled upon and a Rule 304(a) finding was not obtained. We first noted that the defendants' counterclaim was predicated upon the same grounds as their defense to the plaintiff's complaint, and then found that "the order granting summary judgment in favor of the [plaintiff's] complaint necessarily entailed the disposition of the issues raised in the counterclaim as well." *Lynch Imports, Ltd.*, 200 Ill. App. 3d at 785. Accordingly, we concluded that, because the circuit court's order necessarily disposed of the issues raised in the defendants' counterclaim, a Rule 304(a) finding was not required. *Lynch Imports, Ltd.*, 200 Ill. App. 3d at 785; see also *Salemi v. Klein Construction Co.*, 266 Ill. App. 3d 110, 114, 639 N.E.2d 629 (1994); *A.F.P. Enterprises, Inc. v. Crescent Pork, Inc.*, 243 Ill. App. 3d 905, 911, 611 N.E.2d 619 (1993); *International Industrial Leasing, Ltd. v. H.J. Coleman & Co.*, 66 Ill. App. 3d 884, 890, 384 N.E.2d 1 (1978); *Andros v. Hansen Realty Co.*, 44 Ill. App. 3d 635, 358 N.E.2d 664 (1976).

■ We believe the holding in *Lynch Imports, Ltd.* applies equally to the jurisdictional question before us. The intervenors sought a declaration in their amended counterclaim that the height limitation ordinances are valid and constitutional on their face and as applied to the subject property. While it is true that the circuit court did not formally rule on the counterclaim or the motion seeking judgment thereon, by ruling that the height limitation ordinances were constitutionally valid as applied to the subject property, the court implicitly ruled that the ordinances are constitutional on their face. Similar to the situation in *Lynch Imports, Ltd.*, the order entering judgment in favor of the City and the intervenors on count III of LSA's fourth-amended complaint necessarily entailed the disposition of the issues raised in the intervenors' counterclaim. Accordingly, a finding pursuant to Rule 304(a) was not required in this instance. In so holding, we are mindful that there is a line of cases in which this court has held that, absent a Rule 304(a) finding, an order entering judgment is not appealable when a defendant's counterclaim remains

pending. See *Bell v. Home Federal Savings & Loan Ass'n of Elgin*, 38 Ill. App. 3d 652, 654, 348 N.E.2d 527 (1976); see also *Highway Industries, Inc. v. Trailer Leasing Co.*, 48 Ill. App. 3d 235, 236-37, 363 N.E.2d 60 (1977); *Cascade Heating & Air Conditioning Co. v. Westbrook*, 177 Ill. App. 3d 387, 389-90, 532 N.E.2d 377 (1988). We find these cases distinguishable, however, as the counterclaims in those cases set out new facts, prayed for affirmative relief, and showed "grounds by which the jurisdiction of the court may be upheld independently of the original complaint." *Bell*, 38 Ill. App. 3d at 654.

For the foregoing reasons, we find that we have jurisdiction over the instant appeal. We now turn to the merits of the appeal. As noted earlier, LSA contends that the circuit court's finding that the challenged ordinances are constitutionally valid as applied to the property is against the manifest weight of the evidence.

■ At trial, the parties presented expert testimony in support of the factors that a court must consider in evaluating the validity of a zoning ordinance, as set out by our supreme court in *LaSalle National Bank v. County of Cook*, 12 Ill. 2d 40, 145 N.E.2d 65 (1957), and *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill. 2d 370, 167 N.E.2d 406 (1960). The relevant factors (hereinafter referred to as the *LaSalle/Sinclair* factors) include: (1) the existing uses and zoning of nearby property; (2) the extent to which a particular zoning restriction diminishes property values; (3) the extent to which diminishing the plaintiff's property values promotes the health, safety, morals, or general welfare of the public; (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purpose; (6) the length of time the subject property has been vacant as zoned in the context of land development in the vicinity; (7) the community's need for the proposed use; and (8) the care with which the community has undertaken to plan its land use development. *LaSalle National Bank*, 12 Ill. 2d at 46-47; *Sinclair Pipe Line Co.*, 19 Ill. 2d at 378.

In LSA's case in chief, Allen Kracower, an expert in land use and zoning, opined that the property develops its character from the buildings immediately surrounding it and others along the lakefront. Lawrence Okrent, an expert in zoning and land use planning, testified as to the history of zoning in the area and opined that the down-zoning ordinance is inconsistent with the history of zoning and with rational planning considerations. George Kisiel, an expert in zoning and land use planning, testified as to the appropriateness of the height-limitation ordinances as applied to the property and opined that the height-limitation ordinances do not fit the existing development in the area. Also testifying for LSA was Gary DeClark, an expert real estate

appraiser, who opined that the loss in value from the challenged ordinances is several million dollars. John Buenz, LSA's expert architect, testified that he was retained by LSA to design a building on the property in conformity with RPD 196. LSA's expert in real estate marketing, Eugene W. Stunard, opined that there is a strong need and demand for a high-rise development on the property. Finally, David Miller, an expert in traffic engineering, testified as to the effect that increased traffic would have on the area.

Testifying for the City was Timothy Samuelson, an expert in Chicago's architectural history, who described the history of development of the relevant area and opined that the challenged ordinances advance the goal of historic preservation. Thomas Smith, assistant commissioner in the City's Department of Planning and an expert in urban planning and zoning, testified as to the City's land use planning and his own involvement in the passage of the height-limitation ordinances.

In the intervenors' case in chief, Thompson Dyke, an expert in urban planning, zoning, and landscape architecture, opined that, given the history and trend of land use in the neighborhood, the challenged ordinances are reasonable as applied to the property. Peter Land, an expert in light and shadows, gave his opinion as to the impact of shadows cast by LSA's proposed high-rise building, while Thomas Corke, an expert in wind patterns and currents, gave his opinion on the effect of increased winds as a result of the construction of a high-rise building on the property. Also testifying for the intervenors was Carl Hunter, an expert in architecture and one of the intervenors in the case, who stated that he designed an eight-story building which was compatible with the current zoning. Herbert Halperin, an expert in real estate investments, opined that Hunter's proposed building could be developed in an economically feasible manner.

In entering judgment in favor of the City and the intervenors on count III of LSA's fourth-amended complaint, the circuit court applied the *LaSalle/Sinclair* factors and concluded that LSA failed to demonstrate by clear and convincing evidence that the challenged ordinances are arbitrary, capricious, or unreasonable. For the reasons that follow, we find that the circuit court's judgment on count III is not against the manifest weight of the evidence.

A zoning ordinance, as a legislative judgment, is presumptively valid. *State Bank of Countryside v. City of Chicago*, 287 Ill. App. 3d 904, 911-12, 679 N.E.2d 435 (1997). As stated, a court must consider the *LaSalle/Sinclair* factors in evaluating the validity of a zoning ordinance. However, before turning to the individual factors, we address LSA's argument that the circuit court applied the incorrect burden of proof in this case.

■ It is well settled that a party challenging the validity of a zoning ordinance must show, by clear and convincing evidence, that the application of the ordinance is arbitrary and unreasonable, and bears no substantial relation to the public health, safety, or welfare. *Tomasek v. City of Des Plaines*, 64 Ill. 2d 172, 179-80, 354 N.E.2d 899 (1976); *La Grange State Bank v. County of Cook*, 75 Ill. 2d 301, 307-08, 388 N.E.2d 388 (1979); *Cosmopolitan National Bank v. Village of Northbrook*, 138 Ill. App. 3d 967, 973, 487 N.E.2d 55 (1985); *State Bank of Countryside*, 287 Ill. App. 3d at 912. LSA, however, cites to a line of cases which holds that the presumption of validity is substantially weakened where the municipality lacks a comprehensive plan. *Forestview Homeowners Ass'n, Inc. v. County of Cook*, 18 Ill. App. 3d 230, 240, 309 N.E.2d 763 (1974); *Rodriguez v. Henderson*, 217 Ill. App. 3d 1024, 1034, 578 N.E.2d 57 (1991). We have no quarrel with this proposition. However, even if the presumption of validity is weakened in the absence of a comprehensive plan, the burden of proof remains on the party challenging the ordinance to establish its invalidity by clear and convincing evidence. Consequently, we hold that the circuit court properly applied the clear and convincing standard in this case.

■ We now turn to the first *LaSalle/Sinclair* factor, which requires consideration of whether the property is zoned in conformity with the surrounding existing uses and whether those uses are uniform and established. See *La Grange State Bank*, 75 Ill. 2d at 309. The relevant question under this factor is whether LSA's property takes its character from the uses of nearby land, which is a question of fact to be resolved by the trier of fact. *Wakeland v. City of Urbana*, 333 Ill. App. 3d 1131, 1140, 776 N.E.2d 1194 (2002). The parties agree that, although no one *LaSalle/Sinclair* factor is controlling, this first factor is of "paramount importance." See *State Bank of Countryside*, 287 Ill. App. 3d at 913.

LSA first contends that the challenged ordinances are clearly out of character with the well-established patterns and trends of development and zoning in the area. In making its argument, LSA concentrates on the area immediately surrounding the property and the area along Lake Shore Drive. It maintains that the property is surrounded on the north, south, and west by high-rise, high-density uses, and the area along Lake Shore Drive is zoned to create almost a solid block of permitted high-density R8 zoning. According to LSA, notwithstanding this evidence, the circuit court erred by giving considerably more weight to the more distant uses extending many blocks inland from the property. Resolution of this issue turns on defining what constitutes the relevant study area or "nearby land."

At trial, LSA's expert in land use and zoning, Kracower, stated

that, in his opinion, the relevant study area having the "greatest impact" on the property is the immediate block on which the property is situated and the area along the lakefront, which he termed the "Lakefront Corridor." According to Kracower, immediately surrounding the property is a 22-story building to the north on Banks Street; a 30-story building to the west on Ritchie Court; a 41-story building and 27-story building to the south along Goethe Street; and 12 lanes of traffic on Lake Shore Drive to the east. He further testified that the Lakefront Corridor contains mostly high-rise, multifamily residential developments. Kracower stated that he did not consider the relevant area to include the area farther inland from the property because it was "too removed from the site" and inconsistent with the land usage to the east. According to Kracower, the property is the only site located within the confines of the R6 zoning district and, therefore, "stands out as an island onto itself."

The intervenors' planning expert, Dyke, testified that, in determining from where the property takes its character, he considered the surrounding land uses of the "neighborhood" instead of confining the relevant area, as Kracower did, to the block on which the property is located. According to Dyke, the term "neighborhood" refers to a residential area that has parks, schools, homes, cultural institutions, and commercial facilities. It was Dyke's opinion that the boundaries of the relevant area with respect to the property are Lake Shore Drive to the east, North Avenue to the north, Dearborn Street to the west, and Division Street to the south. Samuelson, the City's expert in architectural history, testified that the property is located within the Gold Coast neighborhood, which he characterized as containing a mixture of single-family homes and row houses that have a distinctive scale and character.

In resolving this issue, the circuit court expressly considered the conflicting expert testimony given on the boundaries of the relevant study area. It placed significant weight, however, on Kracower's admission that opinions may differ as to what constitutes the relevant area. The court refused to confine the relevant area to the immediate block on which the property is located or the portion of Lake Shore Drive containing predominantly high-rises. Rather, the court concluded that the relevant study area is the surrounding neighborhood in which the property is located, namely, the portion of the Gold Coast neighborhood referred to as the Near North Historic Area (NNHA), as defined by Dyke. In doing so, the court credited Dyke's opinion that the study area encompasses those elements that are necessary in making a neighborhood, such as schools, parks, residences, and businesses. Having defined the relevant area as the surrounding neighborhood, the

court found that the nearby area is characterized by a mixture of different types of buildings, historic districts, and landmarked properties. Specifically, the court noted that four of the single-family residences that comprise the Seven Houses on Lake Shore Drive Historic District are located less than a block south of the property, while the remaining three houses are located farther north of the property, and the low-rise town houses that make up the Astor Street Historic District are located only two blocks west of the property. The court further noted that the NNHA is comprised primarily of R5 residential property, with 75% of the structures in the area being protected by Chicago landmark ordinances.

With respect to this first factor, LSA further maintains that the circuit court ignored three important considerations; namely: (1) spot zoning; (2) changes to the character of an area as supporting a zoning change; and (3) the existence of nonconforming uses. We will address each argument in turn.

LSA claims that the down-zoning ordinance only affects the property and the practical effect of the height limitation ordinances is likewise limited to the property and, therefore, constitute spot zoning. Spot zoning is a change in zoning applied only to a small area which is out of harmony with comprehensive planning for the good of the community and which violates a zoning pattern that is homogeneous, compact, and uniform. *Hanna v. City of Chicago*, 331 Ill. App. 3d 295, 307, 771 N.E.2d 13 (2002). At trial, Kracower opined that the property is the only site located within the confines of the R6 zoning district, which is inconsistent with land use patterns and, therefore, "would resemble something very close to spot zoning." However, both Samuelson and Dyke testified that the zoning change is consistent with the City's zoning trends since the 1970s. Specifically, Samuelson testified that, after a period of high-rise construction in the 1950s, the City began efforts to preserve the history of the area by landmarking such areas as the Astor Street Historic District and the Seven Houses on Lake Shore Drive Historic District, and landmarking individual buildings. Both he and Dyke stated that, in the 1970s, the City began down-zoning the area to protect the character of the neighborhood. Further, the height limitation ordinances were imposed, not only on the property, but on any new construction located in the R5, R6, R7, and R8 districts, with specific height limitations defined for each district. Although the circuit court did not explicitly discuss the spot-zoning challenge in its written memorandum opinion, the court heard Kracower's opinion in this regard and, by resolving this factor in favor of the City and the intervenors, implicitly rejected LSA's argument as to spot zoning.

LSA next argues that there has been no change in the character of the area which would support a zoning change. We reject this argument for the same reason we rejected LSA's last argument. Although Kracower testified that there has been no significant change in land use patterns in the area since 1975, the City and the intervenors presented expert testimony to the contrary. As stated in our prior discussion, Samuelson and Dyke both testified that there was a trend toward historic preservation and down-zoning since the late 1970s. Further, Dyke stated that he disagreed with Kracower's opinion that there were no changes in the neighborhood on the basis that Kracower concentrated only on the area in the immediate vicinity of the property instead of looking at the neighborhood as a whole. Conflicts relating to the credibility of witnesses and the weight to be accorded their testimony are matters that the trier of fact is in a superior position to resolve. *Firstbank Co. v. City of Springfield*, 253 Ill. App. 3d 844, 849, 625 N.E.2d 804 (1993). Accordingly, the circuit court's election in this instance to find the opinions given by the experts of the City and the intervenors to be more credible is not a matter that we will disturb on appeal.

Finally, LSA argues that the substantial number of nonconforming structures that resulted from the height limitation ordinances weighs in favor of LSA on this first factor. While the mere presence of nonconforming uses in an area zoned for a particular purpose does not automatically invalidate a zoning ordinance (*LaSalle National Bank v. City of Park Ridge*, 74 Ill. App. 3d 647, 660, 393 N.E.2d 623 (1979)), the existence of such nonconformity should be considered in evaluating the total character of the area in question (*Harvard State Bank v. County of McHenry*, 251 Ill. App. 3d 84, 86, 620 N.E.2d 1360 (1993)). In the instant case, the circuit court was also presented with the testimony of LSA's expert in zoning and land use planning, Kisiel, who stated that the height limitation ordinances make a number of existing structures in the NNHA II nonconforming to the height requirements. Although the court did not specifically discuss the nonconforming uses in its written order, the court apparently gave it minimal weight in resolving this factor in favor of the City and the intervenors. As the existence of nonconforming structures is just one of the many considerations a court must consider in evaluating the total character of the area, we do not find that the court erred in giving minimal weight to the nonconforming uses. See *Zeitz v. Village of Glenview*, 304 Ill. App. 3d 586, 596, 710 N.E.2d 849 (1999) (court did not err in giving minimal weight to nonconforming uses in evaluating the total character of the area in question).

For the foregoing reasons, we believe that the circuit court's find-

ing that the property derives its character from the mixture of buildings, historical districts and landmarked properties, and the history of the neighborhood, as defined by the witnesses testifying for the intervenors and the City, is sufficiently supported by the record. Accordingly, we conclude that its determination on the first factor is not against the manifest weight of the evidence.

The next factor for consideration is the extent to which property values are diminished by the particular zoning restrictions. LSA contends that it presented the testimony of DeClark, its expert real estate appraiser, who stated that the loss in value from the challenged ordinances is in the range of $6.7 and $9.8 million, whereas the City and intervenors failed to present any testimony to the contrary.

The fact that property would be worth more if an ordinance restriction was not imposed is not determinative in deciding the validity of a zoning ordinance because, in almost all rezoning cases, the subject property would be worth more if the restriction was not imposed. *Glenview State Bank v. Village of Deerfield*, 213 Ill. App. 3d 747, 761, 572 N.E.2d 399 (1991); *State Bank of Countryside v. City of Chicago*, 287 Ill. App. 3d 904, 915, 679 N.E.2d 435 (1997). Accordingly, this second factor is usually not considered persuasive. *Northern Trust Bank/Lake Forest v. County of Lake*, 311 Ill. App. 3d 332, 339, 723 N.E.2d 1269 (2000). As our supreme court stated in *La Grange State Bank v. County of Cook*, 75 Ill. 2d 301, 309, 388 N.E.2d 388 (1979): "It is not the mere loss in value which is significant. Rather, the loss in value to the plaintiff must be considered in relation to the public welfare. Only when the public welfare does not require the restriction and resulting loss does the loss in value become significant."

The circuit court specifically noted that, although the City and the intervenors failed to call an expert to testify as to the reduction in value, "it would be wholly counterintuitive to think that the value of the Property would not be reduced in these circumstances." The court went on to state that, "while the percentage of reduction is great and the number which that percentage represents is also great, the remaining value is also huge and represents an appreciation of at least $3.9 million from the time of purchase." Although it is true, as LSA suggests, that the confiscatory effect of zoning is not determined by the amount originally paid for the piece of property but, rather, is evidenced by the difference between the fair cash market value of the property as zoned with what that value would be if the property were put to the proposed use (see *DeMarie v. City of Lake Forest*, 93 Ill. App. 3d 357, 363, 417 N.E.2d 641 (1981)), it is also well settled that proof of a large difference in value is insufficient by itself to overcome the presumption of validity of a zoning ordinance. See *Oliver Construc-*

*tion Co. v. Village of Villa Park*, 257 Ill. App. 3d 750, 754-55, 629 N.E.2d 199 (1994) (change in value from $10,000 with existing zoning to $125,000 to $320,000 with prior zoning); *State Bank of Countryside*, 287 Ill. App. 3d at 914-15 (change in value from $250,000 to $750,000); *Wakeland*, 333 Ill. App. 3d at 1138 (change in value from $68,000 to $320,000); *Northern Trust Bank/Lake Forest*, 311 Ill. App. 3d at 339 (change in value "millions of dollars").

The third and fourth *LaSalle/Sinclair* factors are frequently considered together. *St. Lucas Ass'n v. City of Chicago*, 212 Ill. App. 3d 817, 827, 571 N.E.2d 865 (1991); *State Bank of Countryside*, 287 Ill. App. 3d at 915. These factors require a court to consider the hardship the restriction imposes on an owner in light of the extent to which the existing zoning promotes the general health, safety, and welfare of the public. *St. Lucas Ass'n*, 212 Ill. App. 3d at 827. Only by comparing these two factors can a court determine whether the relative gain to the public outweighs any hardship imposed on the owner. *Michalek v. Village of Midlothian*, 116 Ill. App. 3d 1021, 1036, 452 N.E.2d 655 (1983). It is well-established that preserving historic and architecturally significant areas is beneficial to the public. *Grobman v. City of Des Plaines*, 59 Ill. 2d 588, 595, 322 N.E.2d 443 (1975) (preserving aesthetics of area can justify zoning restrictions); see also *LaSalle National Bank v. City of Evanston*, 57 Ill. 2d 415, 432, 312 N.E.2d 625 (1974); *City of Champaign v. Kroger Co.*, 88 Ill. App. 3d 498, 419 N.E.2d 661 (1980) (same). However, the less substantial the relationship of the zoning to the public health, safety, comfort, morals and welfare, the more likely the zoning is invalid and the more significance the diminution in value is given as one of the criteria of invalidity. *Oak Park Trust & Savings Bank v. Village of Palos Park*, 106 Ill. App. 3d 394, 404-05, 435 N.E.2d 1265 (1982). Again, the burden was on LSA to prove by clear and convincing evidence that the challenged ordinances bear no reasonable relation to the public health, safety or general welfare. *Tim Thompson, Inc. v. Village of Hinsdale*, 247 Ill. App. 3d 863, 617 N.E.2d 1227 (1993).

LSA maintains that there was uncontested evidence of the benefits that would result from its proposed development, and the circuit court noted that the added population density, traffic, wind, and shadows as a result of its proposed building "would not outweigh the loss to the owner." LSA argues that, notwithstanding, the court based its ruling on "vague notions of personal taste" and incorrect assumptions about the challenged ordinances by concluding that the public health, safety, and welfare are promoted by "preserving vistas, furthering and enhancing the historic preservation accomplishments, responding to the goals of the community, promoting the aesthetic quality of the

neighborhood, and preserving the character and architectural fabric of the Near North Historic Area." According to LSA, the circuit court's finding was against the manifest weight of the evidence as lakefront views are not protected by zoning law absent a view corridor easement, there is nothing historic on the property that requires preservation, and the challenged ordinances do not remotely affect the "character" or architectural style of any new development.

At trial, Kracower opined that the development of a high-rise building on the property in conformity with the prior zoning designation would provide employment opportunities in terms of the construction, maintenance, and operation of such a building; provide more diverse housing options for the community as a whole; generate greater real estate tax revenues to the City; and cause more secondary income expenditures as a result of its proximity to Michigan Avenue. Okrent, LSA's expert in zoning and land use planning, opined that the down-zoning ordinance produces no discernible public benefit and diminishes the value of an extremely limited resource; namely, the last undeveloped property on Lake Shore Drive. With respect to the height limitation ordinances, Kisiel, another expert in zoning and land use planning, opined that applying a height limitation to the property does not advance the purposes of the ordinances because, *inter alia*, the property is not located within the boundaries of the Gold Coast Historic District and a height limitation would not protect the architectural character of a building in an area where 75% of the buildings are already landmarked. Kracower similarly opined that the height limitation ordinances do not provide any historic preservation benefit, as there are no historic structures surrounding the property.

The City's expert, Samuelson, however, opined that the down-zoning ordinance encourages the protection of older buildings by decreasing the incentive to demolish historic buildings and replace them with high-rise buildings. He further opined that the height limitation ordinances advance the goal of historic preservation by ensuring that any new development will be at a scale that is in harmony with the historic fabric of the neighborhood. It was Samuelson's opinion that constructing a high-rise building on the property would create a "wall" along the lakefront, which would take away from the original character of the neighborhood. Smith, the City's expert in urban planning and zoning, was of the opinion that the height limitation ordinances serve the public good because they provide consistency and predictability with respect to how to develop the community. Finally, Hunter, an expert in architecture and one of the intervenors in the case, stated that there is currently a balance of low-rise and high-rise buildings in the neighborhood, but, in his

opinion, one more high-rise building would "tip the scale" to where the quality of life in the neighborhood would be greatly reduced. Hunter further testified that LSA's proposed high-rise building would close off vistas both into and out of the neighborhood.

The circuit court concluded that the loss of character of the neighborhood outweighs any loss to LSA. In so finding, the court was again charged with resolving the conflicting opinions given by the experts. The court expressly credited the expert testimony presented by the City and the intervenors with respect to the significance of maintaining the character of the neighborhood. See *Michalek*, 116 Ill. App. 3d at 1034 (where opinions may differ with regard to the reasonableness of the existing zoning classifications, the legislative judgment becomes conclusive). Further, in considering the public benefit derived from enhancing the historic preservation of the area, the court did not consider the property in isolation but, rather, as part of a larger neighborhood. With respect to maintaining the character of the neighborhood, it is true, as LSA suggests, that the challenged ordinances do not dictate architectural style; however, as Samuelson opined, they do define the scale of conforming structures. This is especially important in a neighborhood that contains a mixture of both low-rise and high-rise buildings, town houses, and historic buildings. See *Wakeland*, 333 Ill. App. 3d at 1141 ("We are aware of no case holding that a city must designate houses on a street as historical landmarks before passing a zoning ordinance protecting the historical appearance or ambience of the street"). Because it is the circuit court's function to determine the credibility of witnesses and the weight to be accorded their testimony, we will not disturb its decision in this instance to credit the expert testimony presented by the City and the intervenors in support of these factors. It is also for this reason that we reject LSA's reliance on *Harris Trust & Savings Bank v. Duggan*, 105 Ill. App. 3d 839, 435 N.E.2d 130 (1982), *aff'd Harris Trust & Savings Bank v. Duggan*, 95 Ill. 2d 516, 449 N.E.2d 69 (1983), a case in which the invalidity of a down-zoning ordinance was upheld on review based on the deference given to the circuit court's resolution of conflicts in expert testimony and the weight to be given their opinions.

For the foregoing reasons, we conclude that the circuit court's findings that the challenged ordinances promote the health, safety, or general welfare of the public, and the burden imposed on LSA does not outweigh the gain to the public, are not against the manifest weight of the evidence.

We must next consider the suitability of the property for the zoned purpose. The focus of our examination of this factor is on whether the property is suitable for the proposed use, and not the suitability of its

use under the prior zoning. *Homeowners Organized to Protect the Environment, Inc. v. First National Bank of Barrington*, 167 Ill. App. 3d 714, 729, 521 N.E.2d 1202 (1988). LSA contends that it established through expert testimony that the property is more suitable for high-rise development than low-rise development

At trial, Kracower, Buenz, and DeClarke opined that the property is suitable for high-rise development because of its proximity to Lake Shore Drive and Lake Michigan, its rectangular shape and its proximity to other high-rise development. Hunter, however, testified that he had designed an eight-story building that would be a suitable use for the property. The intervenors' expert in real estate investments, Halperin, opined that Hunter's proposed building could be developed in an economically feasible manner. In rebuttal, LSA offered Kisiel's opinion that Hunter's design does not comply with the Chicago Zoning Ordinance because it lacks a 30-foot setback. The circuit court expressly considered the testimony of LSA's experts as to the suitability of a high-rise building on the property, along with Hunter's testimony about his proposal for a low-rise development. The court further considered LSA's claim that Hunter's proposal does not comply with the relevant ordinance, but stated that "these minor concerns do not detract from the fact that the property is suitable for the development as presently zoned." Again, it is the function of the circuit court to make credibility determinations and decide the weight to be given the evidence. Moreover, the court noted that there is a low-rise development which is similar in concept located at 65 East Goethe Street, a mere two blocks from the property. We believe there was sufficient evidence in the record to support the circuit court's conclusion that the property is suitable for development under its current zoning. See *Zeitz*, 304 Ill. App. 3d at 597; *Wakeland*, 333 Ill. App. 3d at 1144.

The sixth *LaSalle/Sinclair* factor requires us to consider the length of time the property has been vacant. "For the fact of vacancy to be significant there must be proof that improper zoning caused the vacancy, not that the property remained vacant merely because no one attempted to develop it or because of some other reason not zoning related." *Bossman v. Village of Riverton*, 291 Ill. App. 3d 769, 779-80, 684 N.E.2d 427 (1997).

LSA contends that this factor is usually considered in a zoning case where a landowner who is denied a zoning change claims the existing ordinance is unconstitutional because it leaves the owner with no ability to develop the property. See *St. Lucas Ass'n*, 212 Ill. App. 3d at 832. LSA maintains that, because this case concerns a challenge to down-zoning, and not the preexisting zoning, this factor is, therefore, "of little relevance." We note, however, that the court

considered this factor in *Wakeland,* a case that also involved down-zoning. *Wakeland,* 333 Ill. App. 3d at 1144; see also *Zeitz,* 304 Ill. App. 3d at 597. Here, the evidence is uncontroverted that LSA has chosen to use the property as a parking lot since purchasing it in 1952 and continues to derive economic benefit from using it in this manner. It is also clear that LSA has not elected to pursue development until the last few years, even though the RPD 196 zoning permitted LSA's desired development for nearly 20 years. Under these facts, we conclude that the circuit court's finding that LSA failed to prove that the vacancy of the property is related to the challenged ordinances is not against the manifest weight of the evidence.

The seventh *LaSalle/Sinclair* factor is the community need for the proposed use. LSA contends that the only expert to testify as to this factor was Stunard, an expert in real estate marketing, who stated that there is a need for a high-rise residential development on the property. The circuit court, however, noted that Stunard also conceded that there is a need and demand for a development of any height, including an eight-story building. With respect to this factor, the court further credited Samuelson's opinion that a 400-foot high-rise building on the property would be detrimental to the neighborhood. In light of Stunard's opinion that there is a need and demand for a building of any height on the property and Samuelson's opinion as to the impact of another high-rise building on the neighborhood, the court found that LSA did not satisfy its burden of proving that there exists a need for a high-rise building on the property. Again, the circuit court is charged with making credibility determinations and deciding the weight to be given the evidence. As a consequence, we cannot say its decision in giving little weight to Stunard's opinion as to the seventh *LaSalle/Sinclair* factor is against the manifest weight of the evidence.

The final *LaSalle/Sinclair* factor we must consider is the care with which the community has undertaken to plan its land use development. LSA contends that the City's lack of an official comprehensive plan substantially weakened the presumption of validity of the challenged ordinances.

The adoption of a comprehensive plan "that incorporates valid zoning goals increases the likelihood that the zoning of a particular parcel in conformity therewith is not arbitrary or unrelated to the public interest." *Northern Trust Bank/Lake Forest, N.A. v. County of Lake,* 311 Ill. App. 3d 332, 340, 723 N.E.2d 1269 (2000). It is true, as LSA asserts, that the presumption of validity of an ordinance is substantially weakened where the municipality lacks a comprehensive plan. *Forestview Homeowners Ass'n v. County of Cook,* 18 Ill. App. 3d 230, 240, 309 N.E.2d 763 (1974); *Rodriguez v. Henderson,* 217 Ill. App.

3d 1024, 1034, 578 N.E.2d 57 (1991). However, a comprehensive plan is only a factor to be considered in determining the validity of an ordinance (see *Forestview Homeowners Ass'n, Inc.*, 18 Ill. App. 3d at 240), and is not itself dispositive (see *Rodriguez*, 217 Ill. App. 3d at 1034). As stated in *First National Bank of Highland Park v. Village of Vernon Hills*, 55 Ill. App. 3d 985, 990, 371 N.E.2d 659 (1977), "the truly important consideration in this regard is whether the community in question has given care and consideration to the use and development of the land within its boundaries." See also *Bossman v. Village of Riverton*, 291 Ill. App. 3d 769, 775, 684 N.E.2d 427 (1997); *Michalek*, 116 Ill. App. 3d at 1038 (despite absence of formal comprehensive plan, court considered other elements of municipal planning, such as village's official map, specifications for street construction and paving, zoning ordinances, and subdivision control ordinances).

Although the Lakefront Plan of Chicago appears to be the sole officially adopted document that directly addresses the development of high-rise structures on Lake Shore Drive, the circuit court noted that the City effectuates its planning by utilizing a number of other resources. First, the court found credible the testimony of the City's expert, Smith, who testified that the City's lack of a comprehensive plan does not mean that the City does not do any planning. According to Smith, the City does strategic planning, focusing on particular issues and adopting policies to address them. The intervenors' expert, Dyke, similarly testified that the City has taken great care in planning. Among other documents, Dyke discussed the Burnham & Bennett plan published in 1909, the 1972 Lakefront Plan of Chicago, the 1973 Lakefront Protection Ordinance, the 1995 Lincoln Park Framework Plan, and a 1987 document entitled "High-Rise High Density." Dyke stated that the City undertakes many planning studies which are periodically used by the City staff, most of which are not adopted officially. We believe that there is sufficient evidence to support the circuit court's finding that the City performs land use planning even though it is not officially adopted into a single document.

With respect to the height limitation ordinances, LSA argues that there was no testimony as to the justification behind the ordinance imposing the 125-foot height limitation. As to the ordinance imposing the 90-foot height limitation, LSA maintains that there was no written analysis, narrative or planning document that explained how the City decided on the ultimate height limits for the R6, R7, and R8 districts. Smith, however, testified in detail about how the height limitations were selected and his involvement in the process. He stated that he evaluated, critiqued, and suggested improvements to both height limitation ordinances. As to the ordinance imposing the 125-

foot height limitation, Smith testified that, although the Department of Planning did not generate a written analysis to explain the evolution of the initial 125-foot height limitation ordinance to the amended version, the ordinance was critiqued and this information was conveyed to the alderman. Smith further stated that he did not approve of the 125-foot height limitation ordinance because it applied the same height limit to every property without regard to the underlying zoning. With respect to the ordinance imposing the 90-foot height limitation, Smith testified that the Department of Planning first gathered information about the building heights in the NNHA with the aide of "Sanborn" maps, which provide measurements of certain buildings, and the use of a "Disto," a piece of laser equipment that measures building heights. According to Smith, after gathering the measurements, he participated in several meetings with the zoning administrator and experts in the area to arrive at a logical approach to selecting the height limitations to ensure that they were appropriate for the permissible bulk of buildings in each zoning classification. Smith testified that the height limitation of 45 feet was selected for the R5 district because most of the buildings located within that district were of that height. He stated, however, that the same methodology was not used to select the other height limits because the goal was to create a logical progression from the height limitation assigned to the R5 district. According to Smith, lot sizes, floor plates, and floor area ratios were used to determine how to allocate floor space in the remaining districts in a manner that would reflect the horizontal and vertical bulk of the buildings. The court found Smith's testimony to be credible in establishing that the City's choice of height limitations for the underlying zoning classifications was not arbitrary or irrational. As the circuit court is charged with assessing the credibility of witnesses, we will not disturb its credibility finding in this regard. Therefore, we conclude that the circuit court's finding that the City takes efforts in planning its land use, despite its lack of an official comprehensive plan, is not against the manifest weight of the evidence.

For the foregoing reasons, we find that the record supports the circuit court's conclusion that LSA failed to prove by clear and convincing evidence that the challenged ordinances as applied to the property are arbitrary, unreasonable, and bear no substantial relation to the public health, safety or welfare. Accordingly, we conclude that the court's finding that the challenged ordinances are constitutionally valid as applied to the property is not against the manifest weight of

the evidence, and we affirm the judgment entered on count III of LSA's fourth-amended complaint.

Affirmed.

SOUTH and KARNEZIS, JJ., concur.